David B. Rosenbaum, 009819
Dawn L. Dauphine, 010833
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, AZ  85012-2793
(602) 640-9000
drosenbaum@omlaw.com
ddauphine@omlaw.com

Leslie M. Smith, P.C., *pro hac vice*
Sarah J. Donnell, *pro hac vice*
Diana M. Watral, *pro hac vice*
J. Bluebond-Langner, *pro hac vice*
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000
lsmith@kirkland.com
sdonnell@kirkland.com
diana.watral@kirkland.com
jessica.bluebond-langner@kirkland.com

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Charlisa Allen, a single woman, as surviving spouse of Robert Allen, deceased, and as the personal representative of the Estate of Robert Allen; Joshua Allen; and Jennifer Allen,<br><br>Plaintiffs,<br><br>vs.<br><br>American Capital Ltd.; Baxter Healthcare Corporation; and Scientific Protein Laboratories, LLC,<br><br>Defendants. | Case No. 2:16-cv-02876-JAT<br><br>**DEFENDANTS' MOTION TO EXCLUDE RONALD MOORE, R.PH.** |

Product identification is an essential element of plaintiffs' claims. Plaintiffs must prove that Robert Allen received (1) Baxter heparin (2) that was ***contaminated***. Plaintiffs allege that Robert Allen received three contaminated Baxter heparin doses: one subcutaneous administration at 6:00 a.m. ("subcutaneous administration"), one bolus at 10:15 a.m. ("first heparin bolus"),[1] and another bolus at 11:52 a.m. ("second heparin bolus"). The parties extensively briefed product identification issues before the MDL Court. That Court held, after considering the evidence, expert affidavits of plaintiffs' expert Patricia Earl, and briefing, "there is no genuine issue of material fact as to whether Baxter manufactured the heparin administered at 6:00 a.m. and 10:15 a.m.; it clearly did not." (Doc # 68, PageID # 1267.)

Plaintiffs had years to develop their product identification evidence, including almost nine months after this Court granted their request for additional time to conduct discovery. Yet plaintiffs *never* sought to depose any Mayo Clinic physician, nurse, or pharmacist as to whether Robert Allen actually received contaminated Baxter heparin. Nor did plaintiffs depose any representative from Cardinal Phoenix, the wholesaler company that supplied Mayo Clinic, regarding relevant product identification evidence. And no new evidence has been produced on product identification since the MDL Court's summary judgment opinion.

Plaintiffs now seek to proffer a new expert, Ronald Moore, to opine on product identification. Moore offers testimony that ignores and seeks to directly circumvent the MDL Court's decision: his view that the subcutaneous administration and first heparin bolus were actually contaminated. Moore then utilizes his same method to opine that the second heparin bolus was contaminated. Moore's litigation-driven opinions do not meet *Daubert*'s standards.

---

[1] Defendants dispute that Robert Allen's first heparin bolus was administered at 10:15 am, but the timing of the dose is not material for purposes of this motion.

1

*First*, Moore attempts to offer an opinion that the subcutaneous administration and first heparin bolus were contaminated Baxter heparin. The MDL Court already granted summary judgment for defendants on these doses.

*Second*, Moore's "analysis" for all three heparin doses is not reliable. His opinion is entirely speculative and lacking in rigor. To assess whether Robert Allen received contaminated Baxter heparin, Moore attempts to trace lot numbers shipped from (a) Baxter to (b) wholesaler Cardinal's Phoenix location to (c) Mayo Clinic. There is no evidence of the actual lot numbers shipped from Cardinal to Mayo Clinic, and no evidence of the lot number Mayo Clinic used with Robert Allen. Instead, Moore speculates that Cardinal Health had a certain number of days of heparin on hand and that Mayo Clinic had a certain number of days of heparin on hand. He adds those two numbers together to get a total turnaround time. Not surprisingly, the numbers he selects lead him to conclude that Robert Allen received contaminated Baxter heparin. This is precisely the kind of junk analysis that *Daubert* prohibits.

*Third*, Moore's opinion is "simple math" and thus does not help the jury.

At bottom, Moore's opinion should be excluded in its entirety, and plaintiffs' other experts should be precluded from relying on this opinion.

## BACKGROUND

### I. The MDL Court's Opinion

Baxter was one of several manufacturers of heparin. For a short period of time in late 2007 and early 2008, some but not all Baxter heparin on the market contained oversulfated chondroitin sulfate ("OSCS"), a previously unknown contaminant designed to mimic heparin. After OSCS was discovered pursuant to a thorough investigation by Baxter, SPL, and government agencies such as the Food & Drug Administration, Baxter tested all lots of heparin it shipped during a certain time period and determined which lots contained OSCS and which did not.

The MDL Court spent years analyzing product identification—namely, whether patients received contaminated Baxter heparin—and considered dozens of

motions on this issue, including a motion for summary judgment brought in this matter on product identification. Plaintiffs filed three briefs in opposition to defendants' motion, and included an affidavit from a product identification expert, Patricia Earl. Earl's analysis mirrored that offered by Moore here: she attempted to trace the flow of contaminated lots from Baxter through Cardinal and Mayo Clinic and ultimately to the patient. The MDL Court rejected Earl's analysis, calling it flawed. (Doc # 68, PageID # 1265.) In particular, the MDL Court criticized Earl for "mak[ing] several sweeping assumptions, unanchored in the record, that allow her to trace specific heparin lots from Baxter to Cardinal to Mayo to Allen" (*id.*), calling her analysis nothing more than "educated guesses regarding the amount of time specific lots of heparin remained in Cardinal's, and then Mayo's, inventory." (*Id.* at PageID # 1266.) In short, Earl's "chain of reasoning [was] simply too tenuous to support her conclusions." (*Id.*) The MDL Court further rejected Earl's argument that the Mayo Clinic record that listed a non-Baxter National Drug Code for the subcutaneous administration and first heparin bolus should be disregarded, stating that "[n]o reasonable jury could reach that conclusion." (*Id.* at 10.)

The MDL Court accordingly held the subcutaneous administration and first bolus dose were *not* contaminated Baxter heparin: "there is no genuine issue of material fact as to whether Baxter manufactured the heparin administered at 6:00 a.m. and 10:15 a.m.; it clearly did not." (*Id.*) The Court also recognized with respect to the second heparin bolus, Earl "cannot state with certainty that the Baxter heparin Allen received at 11:52 a.m. and 11:53 a.m. was contaminated." (*Id.*)

**II.     Moore's Opinions And Analysis**

Plaintiffs retained Moore to perform the same analysis that the MDL Court already rejected with respect to Earl. Moore opines that the subcutaneous administration and first heparin bolus that Robert Allen received (from 5,000 u/ml 1 ml vials) were more likely than not from "Baxter lot number 097039 or 097004 and, therefore, [were] OSCS adulterated Baxter heparin." He also opines the second

3

heparin bolus (from 1,000 u/ml 10 ml vials) was "Baxter lot number 087095 or 087092 and, therefore, was OSCS adulterated Baxter heparin." (Ex. 1, Rpt. at 4.)

Moore's "analysis" amounts to nothing more than a guess that Robert Allen received contaminated Baxter heparin. There is no evidence of what lot number Robert Allen actually received. (Ex. 2, Moore Dep. at 36:14-17.) And although there are records of when Baxter shipped certain lot numbers to Cardinal and whether those lots were contaminated, there is no evidence of when Cardinal shipped lot numbers to Mayo Clinic, how long Cardinal would keep heparin product on hand, whether Mayo Clinic ever received contaminated heparin, whether Mayo Clinic ever received contaminated heparin in the vial size administered to Robert Allen, or how long Mayo Clinic kept heparin on hand. (*E.g.*, Ex. 2, Moore Dep. at 38:19-22.) Lacking this evidence, plaintiffs use Moore to surmise that Robert Allen received contaminated heparin.

### A. Moore's Analysis Regarding The 5,000u/ml 1 ML Vials.

The subcutaneous administration and first heparin bolus were administered from a 5,000 u/ml 1 ml vial. (Ex. 1, Moore Rpt. at 4.) As discussed above, the MDL Court held there was no genuine issue of material fact as to whether these doses were contaminated Baxter heparin—they were not.

While the Court need not even consider Moore's opinions with respect to these heparin doses, Moore's analysis is faulty and has independent grounds upon which to be excluded. Moore concedes that the shipment of Baxter heparin 5,000 u/mL 1 mL vials that Cardinal Health received on October 22, 2007 was not contaminated. (Ex. 2, Moore Dep. at 75:7-11.) He nonetheless insists that Robert Allen received Baxter heparin from the shipment Cardinal Health received on October 26, 2007 or on November 6, 2007. There is no way for Moore to determine that Robert Allen was more likely than not to receive heparin from the October 26, 2007 shipment than the October 22, 2007 shipment. His conclusion is a result of mere guesswork.

4

Moore argues that his conclusion is correct because he can calculate the turnaround time from Cardinal Health to Mayo Clinic's use in a patient by simply adding the time it takes Cardinal to ship to Mayo Clinic, and the time Mayo Clinic keeps inventory on hand. Despite asking this Court for the opportunity to conduct discovery, Plaintiffs never subpoenaed these entities for these actual figures or deposed representatives from these entities. Instead, they substitute Moore's speculation. Moore states that, based on his review of Cardinal's heparin purchase spreadsheets, he "can determine that heparin sits in inventory at Cardinal for seven days before it is delivered to Mayo Clinic." (Ex. 1, Moore Rpt. at 18.) Moore derives his 7-day figure by looking at deliveries of Baxter heparin to Cardinal Phoenix that started *after* Robert Allen's procedure. (*Id.* at App. 3.) He states that because Baxter began delivering a new National Drug Code on December 4, 2007 to Cardinal, and Cardinal subsequently first shipped that NDC to Mayo on December 11, 2007, the Cardinal to Mayo turnaround time is 7 days. (*Id.* at 25.)

Moore's faulty analysis ignores relevant evidence from *before* Robert Allen's procedure. As Moore concedes and the records show, Cardinal last received the prior NDC of 5,000 u/ml 1 ml heparin on November 6, 2017. (Ex. 2, Moore Dep. at 88:1-8; Ex. 1, Moore Rpt. at 17, Table 2.) Mayo Clinic ordered that NDC number through December 5, 2007. (Moore Dep. at 88:1-8; Moore Rpt. at 17, Table 2.) In other words, the records for the actual heparin vial size and NDC number that Moore contends Robert Allen received show that in November 2007 Cardinal kept on hand almost a 1-month supply of heparin 5,000 u/ml 1 ml heparin. (Moore Dep. at 88:9-11.) Moore does not and cannot explain why he ignored this actual evidence in favor of evidence that post-dates Robert Allen's alleged heparin administrations, instead only relying on new "speculation" about ordering practices that he never discussed in his report. (Moore Dep. at 92:13-93:13.) Moore also concedes that the utilization of heparin is "never constant." (Moore Dep. at 56:9-17.) Yet Moore applies the same faulty 7-day timing to shipments that were 120 packages in size (as

in the case of the shipment he contends contained the heparin administered to Robert Allen) and 320 packages in size (as in the case of the October 22 uncontaminated shipment received by Cardinal).  (*Id*. at 57:22-25.)

Moore's analysis of the inventory on hand at Mayo Clinic is similarly unreliable.  Moore concludes that Mayo Clinic has on average a 2-week inventory on hand based on a Mayo Clinic record that states the amount of Baxter heparin that Mayo Clinic had on hand at the time of the full February 28, 2008 recall.  (Ex. 1, Moore Rpt. at 15-16.)  Moore does not explain how the amount of heparin Mayo Clinic had on hand at the time of a February 2008 recall is relevant to what Mayo Clinic had on hand 3 months earlier when Robert Allen was treated.  Moore then uses the 61-package figure that Mayo Clinic had on hand on February 28, 2008 and divides it by the total number of packages of Baxter heparin that Mayo Clinic purchased in December 2007 to obtain the number of days of inventory Mayo Clinic had on hand as of the time of Robert Allen's treatment.  (Moore Rpt. at App. 3.) Moore's analysis amounts to nothing more than a back-of-the-envelope calculation.

The final step of Moore's "analysis" is to add 7 days to 14 days, and conclude that Mayo Clinic used the heparin that Cardinal received 21 days earlier.  The flaws in Moore's analysis are apparent from this very calculation—Cardinal had not received any Baxter heparin 5,000 u/ml 1 ml heparin 21 days prior to Robert Allen's administration.  Moore thus states that it must be one of the last heparin shipments received by Cardinal on November 6 or October 26.  He does not explain why he can exclude that Robert Allen was administered the uncontaminated heparin received by Cardinal on October 22.

**B.    Moore's Analysis Regarding The 1,000 u/ml 10 ML Vials.**

Moore performs a similarly faulty analysis with respect to the 1,000 u/ml 10 ml vials, administered as part of the second heparin bolus.  In fact, Moore concedes he applied the same methodology for all three heparin administrations. (Ex. 2, Moore Dep. at 53:3-7.)

6

First, Moore starts his analysis by limiting his review to 6 shipments of contaminated heparin received by Cardinal from Baxter on dates between October 26, 2007 and December 4, 2007. (Ex. 1, Moore Rpt. at 15, Table 1.) This is in stark contrast to Moore's analysis for the 5,000 u/ml 1 ml vials where Moore considers shipments from Baxter to Cardinal Phoenix as early as September. (Moore Rpt. at 17, Table 2.) It is not surprising that Moore limits the number of shipments with respect to the 1,000 u/ml 10 ml vial; as Moore concedes, every single shipment of heparin 1,000 u/ml 10 ml received by Cardinal Phoenix before these cherry-picked 6 shipments was *uncontaminated*. (Ex. 2, Moore Dep. at 125:3-10.) This includes a shipment received by Cardinal on October 23, 2007, just days before the first shipment in Moore's analysis. (*Id.*) Moore does not and cannot explain how he can exclude the October 23, 2007 shipment and include the October 26, 2007 shipment.

Moore then estimates the amount of time that Cardinal and Mayo Clinic would have had 1,000 u/ml 10 ml heparin on hand. He speculates that because one Baxter document dated January 18, 2008 estimates "existing field inventory of 10 mL vials to be a total of 2.2 weeks of usable Baxter product inventory at the wholesaler and end user locations" (Ex. 1, Moore Rpt. at 16) that Cardinal's Phoenix location would have shipped Baxter heparin in 2007 to the Mayo Clinic 2 weeks after receiving it from Baxter, and that Mayo Clinic would have used that shipped heparin within 2 weeks after receiving it from Cardinal. Moore admitted, however, that the Baxter document is estimating existing field inventory *after* a partial recall of this vial size of heparin and months after the alleged heparin administrations at issue here. (Ex. 2, Moore Dep. at 104:16-25.) Moore also conceded it is possible that Cardinal Phoenix could have varied from this 2-week estimate. (Moore Dep. at 107:7-17.) And he acknowledged that he rounded down the 2.2 week figure included in the Baxter document that he cites to 2.0 weeks. (Moore Dep. at 106:23-107:1.)

As with the 5,000 u/ml 1 ml "analysis," Moore undertakes simple addition, adding 2 weeks for time in inventory at Cardinal plus 2 weeks for time in inventory

7

at Mayo Clinic, to conclude that Mayo Clinic administered heparin to Robert Allen that was received at Cardinal 4 weeks prior to December 2, 2007. He applies that 4-week estimate to Cardinal's records to conclude that Robert Allen received heparin from either lot 087095 or 087092. But if Moore had applied the 2.2 week figure instead or if either Cardinal or Mayo Clinic deviated from the 2 week average, any one of these slight deviations in timing would push Robert Allen's alleged administration into a timeframe when *all* Baxter heparin was uncontaminated.

## **LEGAL STANDARD**

The touchstone for the admissibility of expert evidence is Federal Rule of Evidence 702. Under Rule 702, an expert offering an opinion must be qualified by "knowledge, skill, experience, training, or education." An expert's testimony is inadmissible unless: (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the witness has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Federal Rule of Evidence 702 incorporates the principles the Supreme Court enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert I*"), which held that federal trial courts must serve as "gatekeepers" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. Expert testimony must meet both prongs—relevance and reliability—to be admitted. *See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014). "The duty falls squarely upon the district court to act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Id.* (internal quotation omitted). As the party offering the expert testimony, the burden is on plaintiff to show by a "preponderance of the evidence" that the expert meets the *Daubert* admissibility requirements. *See IMA N. Am., Inc. v. Maryln Nutraceuticals, Inc.*, 2008 WL 4628404, at *4 (D. Ariz. Oct. 17, 2008).

# ARGUMENT

## I. The MDL Court Already Ruled On The First Heparin Bolus And The Subcutaneous Administration.

After full briefing and considering plaintiffs' submission of affidavits from a purported product identification expert, the MDL Court held "there is no genuine issue of material fact as to whether Baxter manufactured the heparin administered at 6:00 a.m. and 10:15 a.m.; it clearly did not." (Doc # 68, PageID # 1267.)  Moore's opinion on the subcutaneous administration and first heparin bolus, which the MDL Court already decided, should be disregarded.

Plaintiffs had ample opportunity to fully brief these issues in the prior summary judgment motion.  The MDL Court allowed them a sur-reply and one additional brief, for a total of three *plaintiffs*' briefs on the issue.  Plaintiffs submitted two expert affidavits for Patricia Earl.  And notably, plaintiffs' final brief contains lawyer argument that in parts is word-for-word the same language used in Moore's expert report.  In particular, plaintiffs included an Appendix A in that final brief that set forth plaintiffs' lawyers' analysis of the shipment pattern of the 5,000 u/ml 1 ml vials (the very vials for which MDL Court ruled there was no genuine issue of material fact); Moore includes an Appendix A that is nearly verbatim to what was included in that brief. (*Compare* Doc # 66 at i-iii, *with* Ex. 1, Rpt. at App. 3.)  In fact, when shown the exhibit from plaintiffs' MDL summary judgment filing, Moore remarked, "That's actually my report, isn't it?"  (Ex. 2, Moore Dep. at 82:4-19.)  He then explained that his opinion is no different from Patricia Earl's earlier analysis: "I pretty much came to the same point that the previous expert witness that they had had come to based on the use of that turnaround for that product."  (Moore Dep at 83:6-9.)

Plaintiffs also took no new discovery that would warrant reconsideration of the MDL Court's opinion.  Although plaintiffs asked the Court last November for additional time to do fact discovery, and the Court granted them almost 9 months of

time, plaintiffs did nothing. Moore's opinions are based on the very same documents that were submitted in conjunction with the last round of briefing and were considered by plaintiffs' former expert Earl. In short, the MDL Court already considered extensive briefing on this very issue and decided against plaintiffs. Moore cannot now come in and offer seek to circumvent the MDL Court's order.

## II. Moore's Opinions Should Be Excluded Because They Are Not Reliable.

Moore's opinions regarding all three administrations should be rejected for an additional reason: Moore's purported analysis is not the product of reliable principles and methods. This, on its own, is grounds for exclusion under *Daubert*.

### A. Moore's Calculation Of Turnaround Time Is Unreliable.

Moore's testimony regarding the turnaround time for heparin at Cardinal and Mayo Clinic is unreliable, as it is "based on speculation and conjecture that renders [it] mere guesses or possibilities." *Lee v. Celotex Corp.*, 764 F.2d 1489, 1491 (11th Cir. 1985). Moore guesses as to the amount of time Cardinal took to ship product to Mayo Clinic, and then guesses as to the amount of time Mayo Clinic took to use product. While Moore purports to base these guesses on documents, the documents he uses are inapposite and Moore draws unreasonable conclusions from them. This renders his testimony inadmissible in its entirety.

*First*, Moore relies on a Baxter document issued post-recall that estimated the inventory at wholesalers and end users to be 2.2 weeks for the 1,000 u/ml 10 ml vials. Moore acknowledges this document was prepared post-recall, two months *after* Robert Allen's heparin administration. (Ex. 2, Moore Dep. at 104:16-25.) Moore fails to explain why a document prepared two months later says anything about Cardinal or the hospital's practices back in October, November, and December 2007. This is particularly problematic where the document discusses inventory *after* a partial recall—meaning the facility is likely to have less product on hand than in non-recall situations. But, more fundamentally, Moore fails to perform any *expert* analysis when using this document. The document upon which he relies discusses

only an "estimate of remaining heparin inventory in the field," based on remaining inventory at five different wholesalers. (Ex. 1, Moore Rpt. at 16 (reproducing BAX 135773).) Moore does not explain why an "estimate" of inventory from five wholesalers says anything about the inventory at Cardinal Phoenix (one location of one wholesaler listed) in particular. For example, Moore concedes he did not "do any review of Mr. DeLuise's analysis that underlined his January 2008 memo" and did not "review[ ] the data that supported Mr. DeLuise's analysis." (Moore Dep. at 103:6-11; *see id.* at 101:5-7.) This is not a reliable expert method.

*Second*, Moore did not even reliably use the information contained in the February 2008 document he cites. Moore concedes that he rounded down from that 2.2-week figure contained in the document to 2 weeks. This changed the turnaround time for heparin from 15.4 days to 14 days. (Ex. 2, Moore Dep. at 106:23-107:1.) Moore failed to explain this change. But it is critical: a change by just a few days could mean Robert Allen instead received uncontaminated heparin—particularly where Cardinal received *uncontaminated* heparin just four days before the shipment that Moore identifies as containing Robert Allen's dose. Without an adequate explanation for this change, Moore's opinion is simply unreliable. *See, e.g., Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) ("Transposition of data based on such conjecture and rough approximation lacks the 'intellectual rigor' required by *Daubert*."); *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1163 (E.D. Wash. 2009) (excluding expert who opined on plaintiff's level of exposure to toxin when "[a]t each step of his analysis, [the expert] bases his analysis upon speculation and/or erroneous data, and without adequate explanation, these steps render his methodology unreliable and misleading").

*Third*, Moore fails to adequately explain why Robert Allen did not receive other *uncontaminated* shipments. Moore acknowledges that the 2 week figure he uses for the 1,000 unit/ml 10 ml dose is just an average. (Ex. 2, Moore Dep. at 107:2-6.) He concedes that "because it's an average based on multiple

11

1  wholesalers, Cardinal could be plus or minus a few days to the 14-day average or
2  2.2 week average." (Moore Dep. at 107:7-11.) As a result, he agreed it was
3  "possible" that Cardinal's inventory supply could instead be "15, 16, 17, 18 days"
4  (*id*. at 107:15-17)—which again would mean Robert Allen received heparin from the
5  uncontaminated heparin shipment on October 23. This itself shows the sweeping
6  assumptions that Moore is making are unreasonable and not "supported by
7  appropriate validation—i.e., 'good grounds.'" *In re Scrap Metal Antitrust Litig.*, 527
8  F.3d 517, 529 (6th Cir. 2008).

*Fourth*, with respect to the 5,000 u/ml 1 ml vial, Moore concedes that data from prior to Robert Allen's treatment date showed Cardinal kept inventory on hand for appropriately a month. (Ex. 2, Moore Dep. at 88:9 11.) Moore could not explain why he instead used a 1-week turnaround time instead of relying on the data showing a one-month turnaround. Experts cannot just ignore data that refutes their opinion. *See, e.g., AHDC v. City of Fresno, Cal.*, 2000 WL 35810720, at *2 (E.D. Cal. Sept. 1, 2000) ("Dr. Myers' opinion as to the income levels of the prospective renters and thus the racial and ethnic effect of the housing exclusion decision as to the Wellington Place development is based solely upon his personal opinion which is contradicted by the undisputed facts. Such opinions are not admissible."); *Good v. Fluor Daniel Corp.*, 222 F. Supp. 2d 1236, 1246 (E.D. Wash. 2002) (excluding expert testimony as unreliable: "Dr. Hoffman does not explain why, given the scientific literature that rejects his task as impossible, his method of estimating doses has accounted for these variables").

In fact, when confronted with this data about the 1-month turnaround, Moore offered new "speculation" about product shortages:

> So I'm—***the only thing I can speculate on*** is that in that time period, knowing that they had a limited supply coming in, that they would have modified their shipping. Mayo Health being one of their probably primary customers, they would have begun parcelling that and holding

12

1  that inventory in stock longer than normal to ship that out.  ***But I'm***
2  ***having to speculate on that because I don't have that information.***
3  (Ex. 2, Moore Dep. at 92:13-93:13.)  This speculation is nowhere supported in the
4  record, and he identifies no actual facts to support it.  This further establishes the
5  unreliability of Moore's testimony.  *See Daubert I*, 509 U.S. at 590 (expert opinion
6  must be based on "more than subjective belief or unsupported speculation"); *United*
7  *States v. Scholl*, 959 F. Supp. 1189, 1197 (D. Ariz. 1997) (excluding expert
8  testimony: "His opinion is not the product of exquisitely designed, highly controlled
9  experimental work but whatever his theory it barely rises above mere speculation.").

10  *Fifth*, again with respect to the 5,000 u/ml 1 ml dose, Moore failed to properly
11  account for a large shipment of *uncontaminated* heparin on October 22, just *four days*
12  before a smaller shipment of contaminated heparin containing the lot that Moore
13  alleges Robert Allen received.  (Ex. 2, Moore Dep. at 75:7-11; 123:1-13.)  The
14  uncontaminated lot received on October 22, 2007 had 320 units—twice as many as
15  the next shipment.  (Ex. 1, Moore Rpt. at 17, Table 2.)  When confronted with this
16  shipment, Moore simply testified, "That doesn't bother me."  (Moore Dep. at
17  79:12-14.)  Again, experts cannot simply ignore evidence that refutes their opinion.
18  *See, e.g.*, *AHDC*, 2000 WL 35810720, at *2; *Good*, 222 F. Supp. 2d at 1246.

19  *Sixth*, Moore's analysis unreliably assumes that the turnaround time for
20  heparin at Cardinal and Mayo Clinic would have been the same length of time
21  regardless of the size of the shipment.  He testified that "for the 1,000 unit 10-mL
22  vials, [he] assume[s] a two-week turnaround time irrespective of how many boxes are
23  in the shipment."  (Ex. 2, Moore Dep. at 57:14-21.)  According to Moore, "whether
24  or not the order was 160 boxes or 320 boxes for the 1,000-unit 10-mL vials, [his]
25  analysis says it's a two-week turnaround."  (Moore Dep. at 57:22-25.)  The same is
26  true for the 5,000 u/ml 1 ml dose, where he assumes a 7-day turnaround.  (Moore
27  Dep. at 58:1-11.)  Yet Moore acknowledges that Cardinal utilizes heparin at different
28  rates:  "the utilization is never constant."  (Moore Dep. at 56:9-17)

13

*Finally*, Moore unquestionably relies on speculation to support his opinions about all heparin doses. Moore acknowledged, for example, that he could not determine which of two lots was more likely administered to Robert Allen for any heparin administration. With respect to the 5,000 u/ml 1 ml vial, Moore explained that identifying a specific lot among the two he selected would "be speculating":

> Q. And do you have an opinion as to which of those two lots, 097039 or 097004, that was more likely administered?
>
> A. I'd be speculating but both of those—those lots were in Cardinal's inventory from Baxter.
>
> Q. And when you say you would be speculating if you had to pick between the two, why is that?
>
> A. Because they both were on their shelf. So whether or not— depending on which one they sent, I would have no way to know. But I know both of them were in their inventory to be shipped out, so it's one or the other.

(Ex. 2, Moore Dep. at 66:15-67:1.) Speculation is not a proper expert method. *See Daubert I*, 509 U.S. at 590; *Scholl*, 959 F. Supp. at 1197.

### B. Moore Improperly Cherry-Picked Data Upon Which He Relies.

Moore's opinion is further unreliable because he cherry-picked data to support his litigation-driven opinion. Moore compiled two tables regarding the shipments of Baxter heparin to Cardinal, one for each vial size at issue. (Ex. 1, Moore Rpt. at 15, 17.) He varied the starting date for each his tables in order to *exclude* uncontaminated heparin from his analysis. Specifically, whereas he believed it was relevant and appropriate to start his table for the 5,000 unit dose on September 18, he did not include any heparin shipments on his table for the 1,000 unit dose until more than a month later, October 23. (*Compare* Rpt. at 15, Table 1, with Rpt. at 17, Table 2; Ex. 2, Moore Dep. at 72:7-12.) Moore could not justify his exclusion of the data in his Table 1. (Moore Dep. at 111:3-7.) But the reason why is simple: all of

the heparin doses Moore excluded from the 1,000 unit table were *uncontaminated*. (Moore Dep. at 125:3-10.) In fact, Moore admitted that "for both tables, the consistent logic is the starting point is the first adulterated shipment." (Moore Dep. at 126:9-12.)

This is nothing but an ends-driven opinion that renders Moore's testimony unreliable. *See, e.g., In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert: "He reaches his opinion by first identifying his conclusion-causation at 200 mg/d-and then cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion.").

### C. Moore's Opinion Fails To Satisfy The *Daubert* Factors.

"The Supreme Court listed four non-exclusive factors for consideration in the reliability analysis: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a known potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific community." *Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1129 (D. Ariz. 2001) (citing *Daubert I*, 509 U.S. at 593-94). Another "'very significant fact' is whether the expert has "developed [his] opinions expressly for purposes of testifying,' since a 'scientist's normal workplace is the lab or the field, not the courtroom of the lawyer's office." *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996). Moore's opinion fails under this framework.

Moore is not "aware of any sort of study or testing of the type of methodology [he] used in this case of tracking orders and inventories back to the manufacturer by lot number." (Ex. 2, Moore Dep. at 132:24-133:3.) Nor has he tested it himself. Moore admitted he never calculated the error rate for his method. (Moore Dep. at 98:23-99:4; *id*. at 132:3-9.) In fact, he readily acknowledges he "did not apply any

15

1 statistical analysis or any means testing to be able to answer" a question about error
2 rate. (Moore Dep. at 98:23-99:4.)

3 Moore also concedes he did not "cite or discuss any industry guidelines or
4 publications or standards on how to trace lots in [his] report." (Ex. 2, Moore Dep.
5 at 18:15-18.) He also acknowledges that while he references various spreadsheets in
6 his report (Ex. 1, Moore Rpt. at 14), he did not "consult any published industry
7 standards in performing the spreadsheet analysis" and was not "aware of any peer-
8 reviewed publication or standard that would govern this sort of analysis" (Moore
9 Dep. at 60:2-12.). Moore also is not "aware of any published industry [ ] standard
10 relating to how long wholesalers or hospitals keep a product like heparin in
11 inventory." (Moore Dep. at 103:25-104:8.) And there can be no question that
12 Moore's analysis was created purely for purposes of litigation. Moore concedes that
13 apart from this case, he has never "relied on analysis of changing NDC codes to
14 determine a hospital's ordering patterns." (Moore Dep. at 79:22-80:7.)

15 The failure to meet the *Daubert* factors is particularly problematic here, where
16 Moore utilized the ***same method*** to determine that all of Robert Allen's heparin doses
17 were allegedly contaminated. (Ex. 2, Moore Dep. at 53:3-7 ("Q. And there's no
18 difference in your methodology for determining that orders 115 and 116 were
19 contaminated versus your methodology in determining that orders 68 and 102 were
20 contaminated, correct? A. That's correct.").) In other words, Moore used the same
21 faulty method to conclude that the second heparin bolus was contaminated Baxter
22 heparin as he used to determine the subcutaneous administration and first heparin
23 bolus were contaminated—doses that the MDL Court already ruled were *not* even
24 Baxter heparin. This is a significant error rate, and certainly not one that *Daubert*
25 contemplates as supporting reliable testimony.

26       **D.**      **Moore Cannot Rely On His Experience To Save His Opinion.**

27 Moore claims that his experience supports his opinions. But an expert relying
28 on experience "must explain how that experience leads to the conclusion reached,

16

why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee notes to 2000 amendment. Moore did work for Cardinal at one point. But he acknowledges he did not "have any role with respect to Cardinal's inventory of heparin at its distribution centers" and did not "have any role with respect [ ] to Cardinal's sale of heparin to its customers in 2007 and 2008." (Ex. 2, Moore Dep. at 24:2-5, 24:22-25.) Moore further conceded he "did not ask anyone at Cardinal Health how long lots of heparin" stayed at Cardinal in 2007 or "how long lots of heparin stayed at the Mayo Clinic before being used in 2007." (*Id*. at 32:10-33:7.) Moore does not sufficiently explain how his general experience in the pharmacy industry allows him to opine how long it would take Cardinal to ship heparin to Mayo Clinic and how long it would take Mayo Clinic to use its heparin supply. Nothing in Moore's experience allows him to derive these turn-around times.

### III.   MOORE'S TESTIMONY IS A SIMPLE MATH CALCULATION.

Finally, Moore's simple mathematical calculations that first add up his speculative conclusion of the turnaround time from Cardinal to Mayo, and from Mayo to Robert Allen and second subtract that number from Robert Allen's administration date would not be helpful to a jury. Moore candidly acknowledged that "[a] lot of this is basic math." (Ex. 2, Moore Dep. at 133:24 134:9.) Courts recognize that what Moore did—namely, "[s]imple addition and division does not qualify as 'scientific, technical, or other specialized knowledge.'" *In re Connolly N. Am., LLC*, 398 B.R. 564, 576 (Bankr. E.D. Mich. 2008).

### CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court exclude the opinions of Ronald Moore in their entirety.

17

DATED this 1st day of September, 2017.

OSBORN MALEDON, P.A.

/s/ Leslie M. Smith
David B. Rosenbaum
Dawn L. Dauphine
2929 North Central Avenue, Suite 2100
Phoenix, AZ  85012-2793

Leslie M. Smith, P.C., *pro hac vice*
Sarah J. Donnell, *pro hac vice*
Diana M. Watral, *pro hac vice*
J. Bluebond-Langner, *pro hac vice*
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654

**Attorneys for Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2017, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will serve notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

Upon receipt of the Notice of Electronic Filing, a copy of the attached document and Notice of Electronic Filing will be mailed to the Honorable James A. Teilborg.

/s/ Leslie M. Smith