**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Charlisa Allen, et al., | No. CV-16-02876-PHX-JAT |
| Plaintiffs, | **ORDER** |
| v. | |
| American Capital Limited, et al., | |
| Defendants. | |

Three sets of motions are pending before the Court. First are Defendants Baxter Healthcare Corporation ("Baxter"), Scientific Protein Laboratories, LLC ("SPL"), and American Capital Limited's ("ACAS") (collectively "Defendants") motions to exclude Plaintiffs Charlisa, Joshua, and Jennifer Allen's (collectively "Plaintiffs") expert witnesses Ronald Moore, (Doc. 149), Suzanne Parisian, (Doc. 150), Clifford Siporin, (*id.*), and all three of Plaintiffs' causation experts, (Doc. 151.) Second are Defendants' motions for summary judgment. (Docs. 162 & 164.) Third is Plaintiffs' motion to exclude Defense expert Dan Fintel. (Doc. 147.) All parties have responded, (Docs. 153, 154, 155, 156, 181, 183), and replied, (Docs. 157, 158, 159, 160, 188, 189.)

## I.    Background

Plaintiffs are the wife and children of Dr. Robert Allen, who they claim was injured and killed by allegedly contaminated heparin produced, marketed, and sold by Defendants. (Doc. 123.) They claim that Defendants are liable under theories of strict liability due to a manufacturing defect, negligence, breach of implied warranty, breach of

express warranty, statutory wrongful death, and statutory survival. (*Id.* at 7–12.) Heparin is an anticoagulant and is one of the most commonly used medical therapies. (Doc. 151 at 4.)

On December 1, 2007, Dr. Allen, a forty-five-year-old radiologist, entered the Mayo Clinic in Scottsdale, Arizona ("Mayo") with abdominal pain and self-diagnosed gastrointestinal disease. (Doc. 155 at 3.) He continued to suffer from this pain throughout the night. (*Id.* at 4.) At around 6:00 a.m. on December 2, 2007, Dr. Allen was given a subcutaneous dose of heparin. (*Id.*) Between 10:15 a.m. and 10:30 a.m., Dr. Allen received a bolus dose of heparin. (*Id.* at 5.) Just before 10:30 a.m., Dr. Allen's ECG strip recorded the beginning of a myocardial infarction, or heart attack, and his telemetry alarm began to sound. (*Id.*) An echocardiogram performed at 10:34 a.m. indicated that there was significant damage to the heart. (*Id.*) Dr. Allen was brought to the cardiac catheterization laboratory at around 11:24 a.m., where he underwent a thrombectomy to extract clots from his heart. (*Id.*) At around 11:53 a.m., in the midst of the thrombectomy, Dr. Allen received two more bolus doses of heparin. (*Id.* at 5–6.) Eventually, Dr. Allen became hypotensive, he vomited blood, and he suffered from cardiogenic shock. (*Id.* at 6.) Following this procedure, he developed heparin-induced thrombocytopenia ("HIT"). (*Id.*) On December 6, 2007, doctors replaced Dr. Allen's heart with a total artificial heart. (*Id.* at 7.) Dr. Allen began to suffer from end organ failure, and on February 27, 2008, doctors replaced the total artificial heart with a human transplant and replaced Dr. Allen's kidneys. (*Id.*) The transplanted heart failed and, despite further procedures, Dr. Allen died on March 7, 2008. (*Id.*)

SPL is a limited liability company that primarily produces heparin active pharmaceutical ingredient ("API"), a precursor to usable heparin medication. (Doc. 162 at 3–4.) It creates API in processing facilities in Wisconsin and in China using crude heparin. (*Id.*) The primary raw material in crude heparin is porcine intestinal mucosa, which SPL sources from intermediaries, who in turn gather intestines from slaughtered pigs in North America and China. (*Id.*) ACAS is a majority shareholder in SPL

Acquisition Corp., the sole member of SPL.  (Doc. 164 at 6–7.)  In 2007, Baxter used SPL heparin API to produce usable heparin medication, which it distributed to wholesalers, who passed it on to end users, such as Mayo.  (*Id.* at 4.)

Toward the end of December 2007, Baxter observed an increase in adverse events from particular lots of their heparin.  (Doc. 151 at 4.)  Baxter notified the authorities of these issues, who launched an investigation.  (Doc. 151 5.)  Public health authorities ultimately concluded that these adverse events were caused by a third party introducing a contaminant, oversulfated chondroitin sulfate ("OSCS"), into crude heparin as a cost-saving measure.  (Doc. 162 at 6.)

Plaintiffs around the country brought suits in state and federal court for harm allegedly caused by contaminated heparin.  (Doc. 151 at 8.)  The federal cases were consolidated by the Judicial Panel on Multidistrict Litigation in the Northern District of Ohio ("MDL court").  (*Id.*)  This case was before the MDL court for over eight years and is the last of the consolidated federal cases.  (*Id.*; Doc. 155 at 2.)

## II.    Legal Standards

This Court has diversity jurisdiction under Section 1332.  See 28 U.S.C. § 1332 (2012); *see also* U.S. Const., art. III, § 2.  A court sitting in diversity applies federal procedural law and state substantive law.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  In the case of Multidistrict Litigation ("MDL"), both the MDL court and the non-MDL court apply the substantive law of the non-MDL court's forum state.  *See In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 699 & n.12 (9th Cir. 2011) (citing *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987)); *Wahl v. Gen. Elec. Co.*, 786 F.3d 491, 494–99 (6th Cir. 2015) (describing the majority view that cases filed directly in an MDL apply the substantive law of the court where the case would have otherwise been brought).  Choice-of-law decisions are substantive and must be settled before further analysis.  *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941).

Both parties implicitly agree, with one exception, that Arizona law applies.  *See,*

- 3 -

*e.g.*, (Doc. 123 at 11–12; Doc. 124 at 21, 24; Doc. 125 at 21, 24.) Therefore, Arizona substantive law governs, except where otherwise noted.[1] *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1495 ("[C]ourts need not address choice of law questions *sua sponte*"); *Ind. Lumbermens Mut. Ins. Co. v. W. Or. Wood Prods., Inc.*, 268 F.3d 639, 644 n.3 (9th Cir. 2001) (applying Oregon law where the parties implicitly agreed that Oregon law applied due to a choice-of-law provision in the governing contract).

Except where "a state evidence rule is 'intimately bound up' with the rights and obligations being asserted," federal evidentiary rules apply. *Wray v. Gregory*, 61 F.3d 1414, 1417 (9th Cir. 1995) (per curiam). Neither party asserts, and this Court finds no indication, that Arizona substantive law supplants the Federal Rules of Evidence in this case. Therefore, the Federal Rules of Evidence shall govern the evidentiary matters presented in the pending motions.

Under Federal Rule of Civil Procedure 54(b), before final judgment, a court may revise its earlier decisions that "adjudicate[] fewer than all the claims" of the parties. Fed. R. Civ. P. 54(b). This broad retrospective power to modify, however, has been narrowed by the law of the case doctrine. Under this doctrine, a court will generally not, as a matter of practice, reexamine its earlier decisions. *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). "For the doctrine to apply, the issue in question must have been 'decided either expressly or by necessary implication in [the] previous disposition.'" *Id.* (alteration in original) (quoting *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990)). Courts retain discretion to apply the doctrine, but abuse that discretion by reopening previously decided issues falling outside of five enumerated

---

[1] This case was filed directly in the MDL court, which sits in the Northern District of Ohio. (Doc. 1.) The MDL court held that direct filing would "have no impact on the choice of law to be applied." *In re: Heparin Prods. Liab. Litig.*, No. 1:08-hc-60000 (N.D. Ohio June 9, 2008) (Doc. 5). Even without that provision, however, this Court finds that if it were not for consolidation in the MDL court, Plaintiffs would have filed their case in Arizona, making Arizona choice-of-law rules applicable under the majority rule governing choice-of-law decisions for cases filed directly in an MDL. *See Wahl*, 786 F.3d at 494–99.

circumstances. *Id.* at 155. Thus, "[d]epending on the nature of the case or the issue," reconsideration may only occur where "(1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; [or] (5) a manifest injustice would otherwise result." *Id.*

The United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") has suggested, however, that the law of the case does not bar a district court from reconsidering its own pretrial rulings before final judgment. *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc) (holding that the law of the case did not bar a court from granting judgment as a matter of law to a party despite previously rejecting that party's motion for summary judgment). In so deciding, the court reasoned that facts continue to develop as a case progresses, which may change the appropriateness of prior rulings. *Id.*

The Ninth Circuit has not held that the law of the case applies to MDL cases; however, courts within this circuit have, *see, e.g.*, *Parkinson v. Novartis Pharm. Corp.*, 5 F. Supp. 3d 1265, 1271–72 (D. Or. 2014), the doctrine applies to other forms of transfer, *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988); *Muth v. Fondren*, 676 F.3d 815, 818–19 (9th Cir. 2012), and the policies of judicial economy and finality that justify MDL litigation, *see* Stanley A. Weigel, *The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts*, 78 F.R.D. 575, 577 (1978); 28 U.S.C. § 1407(a) (noting that transfer is for the "convenience of parties and witnesses" and must "promote . . . just and efficient conduct"), all warrant applying the doctrine to MDL cases. The parties generally accept, and the Court will generally follow, the MDL court's holdings. The few instances where the parties challenge such decisions are discussed below and only in those circumstances will this Court entertain the possibility of reconsideration.

### III. Expert Witness Admissibility

This Court acts as a gatekeeper in considering the admissibility of expert witness

testimony that involves "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a); Fed. R. Evid. 104(a); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). In exercising this gatekeeping function, a court must determine that the experts are qualified, that their opinions are reliable, and that their testimony fits the case. *Daubert*, 509 U.S. at 591–93; Fed. R. Evid. 702. The proponent of the expert bears "the burden of proving admissibility." *Lust v. Merrell Dow Pharm.*, 89 F.3d 594, 598 (9th Cir. 1996); *see Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (hereinafter "*Daubert II*"). This analysis is meant to be flexible. *Daubert*, 509 U.S. at 595. In engaging in this flexible analysis, the Court must not supplant the jury's fact-finding role, *see Daubert*, 509 U.S. at 595; *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006); however, the Court cannot abdicate its gatekeeping role nor delegate that responsibility to the jury, *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir. 2014) (en banc). Ultimately, "shaky but admissible evidence" is better handled by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" than by judicial exclusion. *Daubert*, 509 U.S. at 597; *see Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013).

First, a putative expert must be qualified as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The qualification standard is meant to be broad and to seek a "minimal foundation" justifying the expert's role as an expert. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015–16 (9th Cir. 2004) (quoting *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994)); *see Ericson v. City of Phoenix*, No. CV-14-01942-PHX-JAT, 2016 WL 6522805, at *3–4 (D. Ariz. Nov. 3, 2016) (finding a nurse practitioner qualified to testify regarding asphyxiation, despite her lack of independent research, due to her professional knowledge of, and experience with, strangulation); *Heck v. City of Lake Havasu*, No. CV 04-1810-PCT-NVW, 2006 WL 2460917, at *7–8 (D. Ariz. Aug. 24, 2006) (finding that a professor's extensive study of the effects of carbon monoxide poisoning qualified him to

testify that such poisoning caused the decedent's death, despite the professor having no training in forensic pathology).

Second, the reliability of an expert's opinion is determined almost exclusively by looking at their decision-making process. *Daubert*, 509 U.S. at 593–94. In *Daubert*, the Supreme Court provided four non-exclusive factors to probe the expert's methodology. *Id.* Under this scheme, a court asks whether the expert's methodology "can be (and has been) tested," whether it has been subjected to peer review and publication, what its "known or potential rate of error" is, and whether it has been generally accepted by others in the field. *Id.* A court need not "methodologically walkthrough" each factor, as "not every factor is relevant to reliability in every case." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 924 (9th Cir. 2017); *see Kumho Tire*, 526 U.S. at 142; *Daubert II*, 43 F.3d at 1316–17. Ultimately, "the significance of each factor is case-dependent." *Id.* Furthermore, it is "very significant" whether the expert is testifying "about matters growing naturally and directly out of research they have conducted independent of litigation, or whether they have developed their opinions expressly for the purpose of testifying." *Daubert II*, 43 F.3d at 1317. If the opinion is produced for litigation, the proffering party must provide "other objective, verifiable evidence that the testimony is based on 'scientifically valid principles,'" such as peer review. *Id.* In assessing reliability, a court may peek beyond an expert's methodology to his or her conclusion where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Third, fit "goes primarily to relevance." *Daubert*, 509 U.S. at 591. Testimony is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Fit goes beyond the bare relevance standard, however, in that it further requires that the testimony or evidence "speak[] clearly and directly to an issue in dispute in the case" and "not mislead the jury." *Daubert II*, 43 F.3d at 1321 n.17.

This Court will first analyze Defendants' challenge to Plaintiffs' product

identification expert. Then it will consider the parties' challenges to their opponents' causation experts. Finally, it will consider Defendants' challenge to Plaintiffs' professional standard of care experts.

### A. Plaintiffs' Product Identification Expert

Defendants challenge the opinion of Plaintiffs' product identification expert—Ronald Moore, R.Ph—on three grounds. First, Defendants claim that Mr. Moore, by claiming that the 6:00 a.m. and 10:15 a.m. [2] doses were contaminated, contravenes the MDL court's grant of summary judgment. (Doc. 149 at 1–2.) Second, Defendants aver, Mr. Moore's product identification analysis is not reliable under *Daubert*. (*Id.* at 2.) Third, Defendants argue that Mr. Moore's product identification opinion is based on "simple math," which is not helpful to the jury. (*Id.*)

Because the Court ultimately concludes that Mr. Moore's product identification opinion is unreliable, it does not reach the third issue of whether Mr. Moore's product identification opinion would be helpful to the jury.

### 1. The 6:00 a.m. and 10:15 a.m. Doses

Defendants claim that the MDL court has already determined, on summary judgment, that Dr. Allen was not given contaminated heparin at 6:00 a.m. and 10:15 a.m. (*Id.* at 1–2.) On summary judgment, the MDL court had before it two affidavits by, and the deposition of, Patricia Earl, Plaintiffs' MDL product identification expert.

The MDL court found unpersuasive Ms. Earl's testimony that the 6:00 a.m. and 10:15 a.m. doses were contaminated. *In re: Heparin Prods. Liab. Litig.*, No. 1:10HC60098, 2016 WL 2868684, at *5 (N.D. Ohio May 17, 2016). The MDL court explained that the Pyxis unit, a computerized pharmaceutical dispensing machine, from which the heparin was drawn records such withdrawals. *Id.* In particular, the machine's records have a field for a MedId, which is used for billing purposes, and a MedAltID, which can be filled in by hospital staff. *Id.* The MedAltID for the two doses at issue

---

[2] Defendants contest the timing of this dose, but note that timing is not relevant to this analysis. (Doc. 149 at 1 n.1.)

included the numbers "46912621." *Id.* The MDL court determined that this sequence of numbers represented a National Drug Code ("NDC") number that identifies a drug's manufacturer, the drug type and dosage, and the form of packaging. *Id.* Usually, the MDL court explained, NDC numbers are eleven units long and are broken up by hyphens in the following form: "#####-####-##." *Id.* The FDA sets the manufacturer identification number constituting the first five digits of the code. *Id.* Baxter's manufacturer number is 00641, while 00469 is that of APP Pharmaceuticals, LLC ("APP"), one of Baxter's competitors. *Id.* The MDL court found unpersuasive Ms. Earl's claim that the MedAltId numbers for the two doses at issue were an internal hospital reference number, instead finding that these were NDC codes written in shorthand without the hyphens and zeroes—an occurrence Ms. Earl conceded was possible. *Id.* & n.5. In particular, the MDL Court cited a Defense exhibit showing that APP produced heparin with the NDC number "00469-1262-15." *Id.* at 9. Therefore, the MDL court held that there was no genuine issue of material fact regarding whether the two doses at issue were contaminated Baxter heparin—finding that the NDC number established that these doses were produced by APP—and granted summary judgment on that issue. *Id.* at *6.

Plaintiffs now claim that their new product identification expert, Mr. Moore, has access to a database that their previous expert did not, and can offer proof showing that the MedAltId "46912621" did not represent a current NDC number, thus introducing the possibility that Baxter produced the two doses at issue. (Doc. 156 at 6–9.) Mr. Moore, using information contained in the database, determined that the NDC number 00469-1262-15, which was contained in the exhibit cited by the MDL court, became obsolete on April 30, 2001, which was more than six years before Dr. Allen was given the allegedly contaminated heparin. (*Id.* at 9–10.) According to Plaintiffs, heparin has a shelf life of less than two years. (*Id.* at 8 n.5.) Furthermore, Mr. Moore cited materials provided by Mayo showing that it did not order any drugs with the NDC number 00469-1262-15 in 2007. (*Id.* at 8.) Therefore, Mr. Moore concluded that Dr. Allen could not have been

given a drug with this NDC number. (*Id.* at 8–9.) Rather, Mr. Moore explained that the MedAltID field is filled manually, and is not routinely updated when hospitals switch manufacturers. (*Id.*) This undermines the MDL court's determination that the two relevant doses must have been produced by APP.

Plaintiffs make two arguments as to why this Court is not bound to follow the MDL court's rulings on the two relevant doses. (Doc. 155 at 11.) First, Plaintiffs note that the MDL court only formally denied summary judgment. (*Id.*) Second, Plaintiffs argue that the issue is not finally decided, because Mr. Moore's review of the database produced new evidence that Dr. Allen was not definitively given APP heparin. (*Id.*)

### a.  The Scope of Summary Judgment

Plaintiffs' initial argument is that the MDL court's ruling is not binding because the MDL court only formally denied Defendants' motion for summary judgment. (*Id.*) In other words, Plaintiffs dispute Defendants' interpretation of the conclusion of the summary judgment order, which Defendants interpret to mean that summary judgment was denied only on claims stated in the conclusion and granted on all other claims discussed in the order.

In its decision, the MDL court expressly stated that it found "no genuine issue of material fact as to whether Baxter manufactured the heparin administered at 6:00 a.m. and 10:15 a.m.; it clearly did not." *In re: Heparin Prods. Liab. Litig.*, 2016 WL 2868684, at *5. The MDL court expressly excluded those doses from the paragraph detailing which issues are appropriate for trial. *Id.* at *6–7. However, the MDL court did not restate this holding in the conclusion. Plaintiffs fail to cite authority establishing that a court only grants summary judgment on those issues expressly stated in the conclusion, rather than those explicitly made in the body of the opinion.

If, however, Plaintiffs' argument were correct, this Court would adopt the MDL court's reasoning, based upon the evidence before it at that time, and hold that there was no genuine issue of material fact as to whether the two relevant doses were contaminated Baxter heparin.

#### b. The Law of the Case

Plaintiffs' second argument is effectively that there is substantially different evidence before this Court justifying a departure from the law of the case. (Doc. 155 at 11–12.) Defendants' primary response is that this evidence is not new; while Ms. Earl did not have access to the same database as Mr. Moore, she did have access to public sources of information, such as "RED BOOK" and she twice failed to appropriately explain the information in the Pyxis records. (Doc. 159 at 6–7.)

As an initial matter, the law of the case likely does not bind this Court to follow pretrial rulings, *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc); therefore, it can discretionarily reconsider the motion for summary judgment with no further analysis. However, even applying the law of the case doctrine, Plaintiffs have shown substantially different evidence justifying departure from the prior ruling.

Mr. Moore's explanation that the sequence of numbers in the MedAltID field represents an expired NDC number is clearly substantially different evidence than that presented by Ms. Earl. Ms. Earl did not testify that the code represented an expired NDC number, but rather that the units represented an internal Mayo reference number, which the MDL court justifiably found unpersuasive. Given its dispositive nature, Mr. Moore's testimony constitutes substantially different evidence.

Defendants make four arguments as to why the MDL court's ruling stands. First, there is no new evidence justifying reconsideration. Second, reconsideration frustrates the purpose of the MDL procedure. Third, this Court should defer to the MDL court's expertise. Fourth, Local Rule 7.2 bars Plaintiffs' belated request for reconsideration.

First, Defendants assert, without citation, that this evidence must be new in the sense that it was not previously discoverable and contend that Ms. Earl had the opportunity to access databases that detailed the expiration of the NDC number. (Doc. 149 at 10–11; Doc. 159 at 6–7.) In making this argument, Defendants rely primarily on equitable considerations, arguing that they have "made strategic decisions about fact depositions, decided not to name a product identification expert, prepared a medical

causation expert report, filed *Daubert* motions, deposed plaintiffs' experts, and have been working to prepare a summary judgment motion" in reliance on the MDL court's product identification holding. (Doc. 159 at 5.)

The equitable force of Defendants' argument is diminished by the permissive discovery scheduled set by this Court. Defendants became aware of Mr. Moore's opinion on June 9, 2017. (Doc. 126 at 2.) Defendants then had until July 7, 2017 to make their expert disclosures, August 18, 2017 to depose Mr. Moore, September 1, 2017 to file their *Daubert* motions, and October 6, 2017 to file their motions for summary judgment. (Doc. 144 at 2–3.) Thus, Defendants had nearly a month to assess Mr. Moore's opinion—which plainly introduces a genuine issue of material fact regarding the status of the 6:00 a.m. and 10:15 a.m. doses—and determine whether it would be prudent to retain a product identification expert. Additionally, Defendants took Mr. Moore's deposition on August 30, 2017—over two months after they received his report—and did not once inquire about his opinions regarding the two earlier doses. *See* (Doc. 149-2.) Furthermore, Defendants had nearly three months to address the earlier doses in their *Daubert* motion and four months to address the issue on summary judgment. Simply, Defendants squandered multiple opportunities, over a span of months, to address Mr. Moore's opinions regarding the 6:00 a.m. and 10:15 a.m. doses, despite awareness that discovery was still ongoing and that Plaintiffs had offered Mr. Moore to testify on the earlier doses.

Second, Defendants' contention that the primary purpose of multidistrict litigation—to economize—would be frustrated by reconsidering these issues is unavailing. Multidistrict litigation encourages consolidation to "promote the just and efficient conduct" of actions, 28 U.S.C. § 1407(a); this goal is not met by the MDL court adjudicating issues of fact and law unique to a single action. This reasoning is bolstered by the Judicial Panel on Multidistrict Litigation's opinion consolidating the heparin cases due to "common questions of fact" involving allegedly contaminated Baxter heparin, which would serve to "eliminate duplicative discovery; avoid inconsistent pretrial

rulings; and conserve the resources of the parties, their counsel and the judiciary." *In re Heparin Prods. Liab. Litig.*, 559 F. Supp. 2d 1403, 1404 (J.P.M.L. 2008). Discovery and pretrial rulings on whether Dr. Allen received contaminated Baxter heparin at particular times do not bear on the common questions of fact that justify multidistrict litigation.

Third, Defendants' appeal to the MDL court's specialized expertise, gained over a period of years adjudicating cases involving allegedly contaminated heparin, does not squarely bear on this issue. While the MDL court surely obtained an impressive understanding of the issues in this case, including product identification, its decision regarding the earlier doses was grounded in a different set of evidence than that before the Court today. The MDL court did not have the benefit of Mr. Moore tracking down the defunct NDC number and his equally important explanation as to why that number remained in the MedAltID field. Thus, even without the MDL court's extensive experience with scores of heparin cases, this Court is confident that Mr. Moore has unsurfaced a genuine issue of material fact regarding whether the earlier doses were contaminated Baxter heparin.

Fourth, the Local Rules do not bar Mr. Moore's testimony for two reasons. First, this Court need not even address Defendants' invocation of the Local Rules, because Defendants raise this argument for the first time in a reply brief, depriving Plaintiffs of an opportunity to respond. *See Sonoran Res., LLC v. Oroco Res. Corp.*, No. CV-13-01266-PHX-JJT, 2015 WL 11089497, at *7 n.4 (D. Ariz. Apr. 17, 2015); *MJG Enters., Inc. v. Cloyd*, No. CV-10-0086-PHX-MHM, 2010 WL 3842222, at *6 n.1 (D. Ariz. Sept. 27, 2010). Second, good cause provides an exception to the timing requirements of Local Rule 7.2(g)(2). *See* LRCiv 7.2(g)(2). Good cause exists for Plaintiffs' belated filing, given the irregular procedural structure of this proceeding under which the parties were subject to multiple periods of discovery.

## 2. Reliability

Defendants next argue that Mr. Moore's opinion is unreliable for four reasons. First, Mr. Moore's turnaround time calculation is unreliable. (Doc. 149 at 11.) Second,

Mr. Moore improperly cherry-picked the data that he relies upon. (*Id.* at 15.) Third, Moore's opinion fails to satisfy the *Daubert* factors. (*Id.* at 15–16.) Fourth, Mr. Moore's experience does not make his opinion reliable. (*Id.* at 17.)

### a. Turnaround Time

Mr. Moore provided two different conclusions regarding the turnaround time of heparin. First, Mr. Moore concluded that "it was more likely than not" that Dr. Allen received contaminated Baxter heparin from 1,000U/ML in 10ML vials for order numbers 115 and 116. (Doc. 149-1 at 5.) Second, he concluded that it was "more likely than not" that Dr. Allen received contaminated Baxter heparin from 5,000U/ML in 1ML vials for order numbers 68 and 102. (*Id.*) To reach these conclusions, Mr. Moore had to opine regarding the amount of time the wholesaler ("Cardinal") held onto Baxter heparin, which lot numbers of heparin that Cardinal shipped to Mayo, and the amount of time Mayo stored heparin before using it.

Mr. Moore's opinion is based on a number of sources. First, Mr. Moore relies on his experience in the pharmaceutical industry, with emphasis on his experience at Cardinal in particular. As part of this experience, Mr. Moore claims that pharmaceutical wholesalers and hospitals follow two industry standards: just-in-time inventory practice, under which product is ordered as needed rather than stockpiled, and first-in, first-out ("FIFO"), where drugs are shipped and utilized in chronological order to prevent expiration. (*Id.* at 13–14.) Second, he relies on four spreadsheets—one from Baxter describing shipments to Cardinal, one from Cardinal describing all Cardinal purchases of heparin, one from Cardinal describing all heparin shipments to Mayo, and one from Mayo showing all purchases of heparin from Cardinal. (*Id.* at 10–11.) The Mayo and Cardinal spreadsheets include the manufacturer name, the NDC number, the amount of heparin in each package, the order quantity, and the shipment quantity. (*Id.*) The Baxter spreadsheet contains the same information with the addition of lot numbers. (*Id.* at 11.) Third, Mr. Moore relies on a document by Baxter detailing the contaminated shipment lot numbers. (*Id.*) Fourth, Mr. Moore relies upon a memo produced by a Baxter employee

estimating the amount of uncontaminated Baxter product remaining in the field. Fifth, Mr. Moore relies on written Mayo policies detailing drug purchase times, inventory review, and drug expiration disposal. (*Id.* at 12–13.) Sixth, Mr. Moore relies on a Mayo document describing how much heparin they sent back in the recall. (*Id.* at 26–27.)

Defendants aver that Mr. Moore's calculations for the turnaround times for the heparin at Cardinal and Mayo are based upon speculation. (*Id.* at 11.) Generally, Defendants claim, Mr. Moore guesses as to how long it took for Cardinal to ship heparin to Mayo, and then guesses as to how long it took Mayo to use the heparin upon receipt. Defendants argue that Mr. Moore's reliance upon documents to justify his guesses is unfounded because he "draws unreasonable conclusions from them." (*Id.*) Thus, Defendants conclude, Mr. Moore's testimony is unreliable. (*Id.*)

### i. 1,000U/ML in 10ML Vials

Mr. Moore claims that it is more likely than not that Dr. Allen received two doses of contaminated Baxter heparin contained in 1,000U/ML in 10ML vials. To reach this conclusion, Mr. Moore tracks contaminated Baxter heparin, via the lot numbers and shipment information provided by Baxter, to Cardinal. (*Id.* at 16.) Once at Cardinal, Mr. Moore can no longer track lot numbers, but instead bases his opinion on industry practices—namely, just-in-time inventory and FIFO—the shipment times, the quantity, and the NDC numbers of heparin moving from Cardinal to Mayo, and the Baxter employee memo detailing the amount of uncontaminated Baxter heparin remaining in the field. (*Id.*) Ultimately, Mr. Moore concludes that because Cardinal only had contaminated heparin for the five weeks preceding December 2, 2007, and because Cardinal and Mayo each stored that heparin for two weeks, Dr. Allen more likely than not received contaminated Baxter heparin. (*Id.* at 15–17.)

First, Defendants argue that Mr. Moore's calculation of the turnaround time of two weeks for the 1,000U/ML in 10ML vials is unreliable, because it is based, in part, upon a post-recall Baxter document discussing average Baxter heparin supplies. (Doc. 149 at 11–12.) This Baxter memo prepared by E. DeLuise, a Baxter employee, ("DeLuise

Memo") discusses four wholesalers, including Cardinal, who make up 85% of Baxter's heparin sales for the relevant dose sizes.  (Doc. 149-1 at 17.)  The relevant portion of this memo states:

> [F]rom a historical perspective, there is approximately 2 weeks inventory stored on average at the end user location . . . . I estimate that the existing field inventory of 10 [M]L vials to be a total of 2.2 weeks of usable Baxter product inventory at the wholesaler and end user locations.

(*Id.*)

Defendants first contend that the DeLuise Memo does not support Mr. Moore's conclusion, because it was written after Baxter's recall of heparin, and both fails to discuss pre-recall supplies at wholesalers and hospitals and establishes a shorter turnaround time due diminishing post-recall supplies.  (Doc. 149 at 11.)  Plaintiffs respond that the memo expressly discusses historical averages, thus implicating pre-recall supplies of heparin.  (Doc. 156 at 14.)

The memo temporally distinguishes its conclusions as to past data—that end users, like Mayo, historically and on average have two weeks of heparin on hand—with its estimations as to the current post-recall amounts of heparin held by both wholesalers, like Cardinal, and end users.  Thus, the fact that there was a recall does not affect the memo's conclusion as to the two week time period for end users at the time Dr. Allen received heparin.  With regard to wholesalers, however, the memo only estimates post-recall turnaround times of 2.2 weeks.

Plaintiffs contend that Defendants are "disingenuous" for making the argument that there would be less inventory due to the recall, because the recall occurred one day before the memo went out.  (Doc. 156 at 14 n.9.)  The memo, however, takes into account "*usable* Baxter product," meaning that it does not count any potentially-contaminated recalled products.  (Doc. 149-1 at 17 (emphasis added.))  The practical difficulties in implementing a recall do not bear on this analysis, because the memo analytically takes into account only non-recalled product.

Defendants next contend that the memo does not provide support for Mr. Moore's

conclusion as to wholesalers, because it averages the data from four[3] different wholesalers to reach the 2.2 week turnaround time for wholesalers. (Doc. 149 at 12.) Plaintiffs do not respond to this contention. *See* (Doc. 156.) This certainly does cut against the appropriateness of Mr. Moore's reliance on the report, given that Cardinal's inventory could have varied greatly from that of other wholesalers, which would not be clearly reflected in the average. Although unraised by Defendants, the same logic seems to corrupt the reliability of the memo's estimation of end user inventory as well. *See* (Doc. 149-1 at 17 ("[T]here is *approximately* 2 weeks inventory stored *on average* at the end user location") (emphasis added.)) Thus, without more, Mr. Moore's reliance on the memo was misplaced and lessens the reliability of his expert opinion.

Plaintiffs contend that Mr. Moore independently corroborated the memo's conclusions through personal experience working at Cardinal and independent review of records from Cardinal and Mayo showing two week turnaround times. (Doc. 156 at 13.) As Defendants note, however, Mr. Moore's experience does not directly support his opinion, because he was not involved in Cardinal's sale of heparin to end users during 2007, he did not request information from Cardinal or Mayo on how long they stored heparin, and he was not aware of how long it took Cardinal to ship heparin to Mayo. (Doc. 149 at 17.) While his experience working at Cardinal gave him some specialized knowledge as to Cardinal's internal practices, his lack of familiarity with heparin, Cardinal's storage of heparin, and Mayo's storage practices detract from the corroborating power of his opinion. Additionally, as discussed below, Mr. Moore's independent analysis of Cardinal and Mayo turnaround times is unreliable.

Defendants next contend that Mr. Moore improperly used the DeLuise Memo to determine that Cardinal had a two week turnaround time. (Doc. 149 at 12.) As Defendants note, and as discussed above, the memo estimates that end users historically

---

[3] Defendants contend that there are five wholesalers considered in the report. (Doc. 149 at 12.) This Court, however, counts only four: "[W]e have contacted the following wholesalers: McKesson, Cardinal, Morris & Dickson, and AmeriSourceBergen." (Doc. 149-1 at 17.)

had a two week turnaround time, while end users and wholesalers had 2.2 weeks of inventory at the time the memo was written. (Doc. 149-1 at 17.) Mr. Moore—without explanation—concluded that Cardinal, a wholesaler, had a two-week inventory of heparin, despite the report estimating 2.2 weeks. (*Id.*) Defendants argue that that this unexplained rounding down has a practical impact, because Cardinal had received a shipment of uncontaminated heparin "just four days before the shipment that Moore identifies as containing Robert Allen's dose." (Doc. 149 at 12.) Plaintiffs respond that this rounding down does not affect Mr. Moore's conclusion, because he "identifies as likely containing Dr. Allen's dose" contaminated shipments "received by Cardinal on November 12 and 16, 2007." (Doc. 156 at 14.) Plaintiffs go on to say that the prior two shipments, on November 5, 2007 and October 26, 2007, were also both contaminated. (*Id.*) Defendants correctly respond that Mr. Moore never limited Dr. Allen's doses to November 12 and 16, but rather concluded that Dr. Allen likely received "Baxter lot number 087095 or 087092," which totaled six shipments to Cardinal, and lot number 087095 was received as early as October 26, 2007. (Doc. 159 at 11; Doc. 149-1 at 17.) Just four days before that date, Cardinal received a shipment of uncontaminated Baxter heparin. (Doc. 194-2 at 76.) Plaintiffs note that Mr. Moore testified that Cardinal's practices would put them "at the lesser end of average rather than the greater." (Doc. 156 at 14.) Mr. Moore admitted, however, that if one used the unrounded 2.2 weeks from the DeLuise Memo, it was "within the realm of possibility" that the lot 087092 would not have even been received by Mayo in time for use in Dr. Allen's procedure, (Doc. 130–31.) The uncertainty in Mr. Moore's opinion arises from him "not knowing . . . the specifics." (*Id.* at 131.) Uncertainty regarding reasonably obtainable information weighs against methodological reliability.

Furthering this point was Mr. Moore's testimony that it was possible that "Cardinal's inventory supply [of heparin] could be 15, 16, 17, 18 days." (Doc. 149-2 at 108.) Mr. Moore testified that this higher end was not likely, because Cardinal wanted to maintain a "thin" supply to obtain a "maximum return on" investment. (*Id.* at 109.) But

Mr. Moore still must rely on speculation, based upon his experience with Cardinal in the past, in a different department, involving a different region of the country, with different drugs, to reach this conclusion. Thus, Mr. Moore's methodology does not reliably provide the basis for the conclusion that it was more likely than not that Dr. Allen received contaminated rather than uncontaminated heparin from the 1,000U/ML in 10ML vials.

### ii. 5,000U/ML in 1ML Vials

Mr. Moore concluded that Dr. Allen more likely than not received two doses of contaminated Baxter heparin from 5,000U/ML in 1ML vials. Mr. Moore's analysis of these doses is similar to that of the 1,000U/ML in 10ML vials, and results in Mr. Moore finding that there is a 21-day turnaround period from Cardinal receiving the heparin from Baxter to the patient receiving the heparin at Mayo. (Doc. 149-1 at 19.) Mr. Moore determined that the two lots Baxter shipped to Cardinal closest to 21 days before Dr. Allen received heparin at Mayo were lots of contaminated Baxter heparin. (*Id.*) One of these shipments, received November 6, 2007, was the last contaminated shipment containing NDC number 0641-0400-25. (*Id.*) The next shipment, which Cardinal received on December 4, 2007, was also contaminated and included a different NDC number. (*Id.*) The heparin with the new NDC number was first received by Mayo on December 11, 2007, which led Mr. Moore to conclude that the turnaround time from Cardinal to Mayo was one week. (*Id.* at 26.)

Defendants contend that Mr. Moore's testimony that Cardinal turned around heparin in a week conflicts with the evidence that Cardinal did not receive any heparin for a month, suggesting that Cardinal did not completely turnover its heparin within a week. (Doc. 149 at 13; Doc. 149-2 at 89.) Mr. Moore's failure to explain his departure from this evidence, Defendants contend, makes his opinion unreliable. (*Id.*)

Plaintiffs attempt to defend Mr. Moore's opinion on this front by noting that Mr. Moore opined that there was a supply problem, and that past data showed a one week turnaround time. (Doc. 156 at 16.) But Mr. Moore's suggestion of a supply problem is

pure speculation. According to Mr. Moore:

> [There was] some problem that I *guess* Baxter had recognized. Because their shipments up to that point had been fairly regular, and then all of a sudden, you have something that's changed. Because the next entry after that, almost 28 days, is a brand-new NDC number, which that would have meant they were having to – they were depleting the inventory down even further . . . . [T]he only thing I can *speculate* on is that in that time period, knowing that they had a limited supply coming in, that they would have modified their shipping. Mayo Health being one of their *probably* primary customers, they would have begun parceling that and holding that inventory in stock longer than normal to ship out. *But I'm having to speculate on that because I don't have that information.*

(Doc. 149-2 at 90, 93–94 (emphasis added.))

Mr. Moore, through speculation, invents a supply chain problem to explain away contrary evidence, which diminishes the reliability of his expert opinion. *See Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) ("An opinion based on . . . unsubstantiated and undocumented information is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702."); *United States v. Scholl*, 959 F. Supp. 1189, 1197 (D. Ariz. 1997) (excluding as unreliable expert testimony that "barely r[ose] above mere speculation.").

Defendants further attack Mr. Moore's opinion regarding the 5,000U/ML in 1ML vials by claiming that he failed to account for Cardinal receiving a large shipment of uncontaminated heparin "just four days before a smaller shipment of contaminated heparin containing the lot that Moore alleges" that Dr. Allen received. (Doc. 149 at 14 (emphasis removed.)) Plaintiffs respond by arguing that Mr. Moore did consider this larger shipment and that their disagreement with his conclusion is a matter appropriate for cross-examination rather than exclusion. (Doc. 156 at 16.)

Specifically, Cardinal received 320 packages of uncontaminated heparin on October 22, 2007. (Doc. 149-1 at 18.) Mr. Moore opines that Dr. Allen could have received heparin from a contaminated shipment of 160 packages that Cardinal received on October 26, 2007, just four days later. (*Id.*) When asked why he concluded that it was

more likely than not that Dr. Allen received the contaminated heparin from the smaller shipment rather than the uncontaminated heparin from the larger shipment, Mr. Moore replied that the larger shipment "would have been at the front end of anything that they were distributing out to other locations, *which that's – that's information that – that is not available to me* . . . . [I]t just seems reasonable that the only thing left to be distributed were two other [contaminated] lots."  (Doc. 149-2 at 98 (emphasis added.))  Defense counsel probed Mr. Moore by asking "You say it seems reasonable.  But without knowing Cardinal's inventory and what other customer Cardinal was shipping" this form of heparin to "you don't know with any certainty whether Cardinal's shipment to Mayo came from" the contaminated lot "versus a prior lot?"  (*Id.*)  Mr. Moore replied that based upon Cardinal's "distribution pattern . . . it just seems reasonable that was the only thing they would have had to ship at that point."  (*Id.* at 99.)

Mr. Moore never explains, beyond relying on just-in-time inventory and FIFO, why it was more likely than not that Dr. Allen received heparin from the smaller contaminated shipment rather than the larger uncontaminated shipment.  Compounding this uncertainty is Mr. Moore's admission that he is unaware of the number of end users to which Cardinal sells heparin.  Thus, Mr. Moore's methodology does not reliably provide the basis for the conclusion that it was more likely than not that Dr. Allen received contaminated rather than uncontaminated heparin from the 5,000U/ML in 1ML vials.

### iii.    All Vial Sizes

With regard to both vial sizes, Defendants contend that Mr. Moore's turnaround analysis fails to account for changes in shipment size.  (Doc. 149 at 14.)  Plaintiffs respond that Mr. Moore did account for changes in shipment size by noting that shipment size fluctuates with expected sales.  (Doc. 156 at 16.)  Countering this reasonable explanation, however, is the following exchange between Mr. Moore and Defense counsel, where Mr. Moore agreed that size of a shipment affects its relevancy to the analysis:

Q. I assume you thought it was relevant and appropriate to list the September 18 shipment in Table 2 in this analysis of the 5,000-unit dose?
A. Right. That's a good – that's a fairly high quantity, 320 times 25. That's a lot of tainted heparin to have on their shelves.

(Doc. 149-2 at 73.)

Thus, Mr. Moore fails to take one approach to the size of shipments in his analysis. On the one hand, Mr. Moore claims to treat all shipments consistently, regardless of size, but on the other hand, Mr. Moore highlighted certain shipments as more important than others due to their size. This inconsistent approach suggests deficiencies in his methodology.

Finally, with regard to both doses, Defendants contend that Mr. Moore's concession that he could only say more likely than not that Dr. Allen received heparin from either of two contaminated lots, rather than one specific lot, "alone warrants exclusion." (Doc. 149 at 15; Doc. 159 at 12.) The Court disagrees that this form of conclusion diminishes the reliability of Mr. Moore's methodology. *Daubert* does not require certainty.

### b. Cherry Picking

Defendants further contend that Mr. Moore cherry-picked the data for his analysis to produce a litigation-driven result. (Doc. 149 at 15.) Specifically, Mr. Moore's report includes two tables that individually list shipments from Baxter to Cardinal of 5,000U/ML in 1ML vials and 1,000U/ML in 10ML vials respectively. (*Id.*) These tables utilize different start dates and end dates that Defendants contend were chosen to exclude uncontaminated shipments. (*Id.*)

Plaintiffs respond that this is a matter appropriate for cross-examination and that Mr. Moore chose as relevant start dates the time Cardinal originally received contaminated heparin from Baxter. (Doc. 156 at 12.) He did not include earlier uncontaminated shipments, Plaintiffs claim, because he did not believe that such shipments would be available for Dr. Allen on December 2, 2007. (*Id.*)

Mr. Moore did effectively cherry-pick data. While he determined that the

turnaround times for the 5,000U/ML in 1 ML vials and 1,000 U/ML in 10ML vials were three weeks and four weeks respectively, he chose to display a longer period of data for the 5,000U/ML in 1 ML vials, which had a shorter turnaround time. The effect of this was to exclude prior shipments of uncontaminated heparin from the 1,000 U/ML in 10ML vials table, which had a longer turnaround time. Regardless of whether the lots were actually available to Dr. Allen on December 2, 2007, Mr. Moore's report displays an ends-driven approach in presenting the data, which negatively affects the reliability of his opinion.

### c. *Daubert* Factors

Defendants next contend that Mr. Moore's analysis fails to satisfy the four non-exclusive factors that the *Daubert* Court suggested would indicate methodological reliability. (Doc. 149 at 15.) Specifically, Defendants argue that Mr. Moore's methodology has not been tested, that it has no known rate of error, and that it has not been published or peer reviewed. (*Id.* at 15–17.) Defendants do not claim that Mr. Moore's methodology is not generally accepted in his field.

Plaintiffs respond by noting that *Daubert*'s factors are non-exclusive, that Mr. Moore's methodology is reliable because it is not produced for litigation and he routinely uses it in his professional practice, and that there are published guidelines. (Doc. 156 at 10–11.) Plaintiffs admit, however, that Mr. Moore "did not perform any error rate calculation on *this analysis*, subject this analysis to peer-review, or cite published standards in his report." (Doc. 156 at 10–11 (emphasis in original.))

The *Daubert* factors readily apply to Mr. Moore's analysis. Mr. Moore's tracking analysis is susceptible to testing, but Plaintiffs do not show that it has ever been subject to formal testing. Although part of Mr. Moore's analysis seems to be based in peer-reviewed literature, the entirety of his method is not. Mr. Moore used "[s]ome of" the methodology contained in published Drug Enforcement Administration guidelines. (Doc. 149-2 at 15.) Additionally, Mr. Moore notes that "[t]here are some published reports on how to look at information," and that the analysis is "very similar to practices that an

industrial engineer would use." (*Id.*) At the same time, Mr. Moore did not "cite or discuss any industry guidelines or publications or standards on how to trace lots" in his report. (Doc. 149-2 at 19.) Furthermore, Mr. Moore could not name any written standards governing FIFO and just-in-time inventory techniques, which were critical to his analysis. *See* (Doc. 149-2 at 28.) Thus, to the extent that Mr. Moore's analysis strays from the peer-reviewed guidelines, it is less reliable. As Plaintiffs admit, Mr. Moore's analysis has no known rate of error, despite it being susceptible to statistical analysis, which weighs against reliability. Finally, Mr. Moore's form of analysis is generally accepted in his field, which weighs in favor of reliability.

The parties clash over whether Mr. Moore's analysis was litigation-produced. Plaintiffs contend that Mr. Moore regularly uses this form of analysis in his professional practice. (Doc. 156 at 11.) Defendants respond that Mr. Moore admitted to never having "relied on analysis of changing NDC codes to determine a hospital's ordering patterns before." (Doc. 149 at 17.) Overall, Mr. Moore's methodology was not litigation-produced, which weighs in favor of reliability; however, this reliability is slightly tempered by the litigation-produced consideration of changing NDC codes, which only affected his opinion of the 5,000U/ML in 1ML vials.

On balance, the *Daubert* factors as applied to this case suggest exclusion of Mr. Moore's expert testimony. This Court finds significant the fact that Mr. Moore's analysis has never been subject to formal testing and that there is no known rate of error despite the availability of statistical analysis. Although partial reliance on peer review, not producing the analysis for litigation, and general acceptance certainly weigh in favor of reliability, they do not overcome the deficient factors that are more pressing in this case.

### d. Mr. Moore's Experience

Defendants contend that the lack of reliability of Mr. Moore's opinion cannot be overcome due to his experience. (Doc. 149 at 17–18.) Experience can support an expert's opinion where the expert explains "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience

is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

Mr. Moore holds a B.S. in Pharmacy from Northeast Louisiana University and has worked has worked as a registered pharmacist for over thirty years. (Doc. 149-1 at 2, 33; Doc. 149-2 at 10.) For much of this time, Mr. Moore worked at Cardinal in various roles, including Director of Operations, Pharmacy Services Division; Medication Executive, Integrated Provider Solutions; Director of Operations, Due Diligence; Operations Director; Operations Director for the Louisiana, Arkansas, and Mississippi Business Unit; Operations Resource Manager of the Southeast Region for Cardinal's Pharmacy Management Division; and Team Leader, Transition Team of Cardinal's Owen Healthcare Division. (Doc. 149-1 at 2–3.) In these roles, Mr. Moore, among other things, interfaced with corporate clients, oversaw teams of employees and pharmacy management, prepared and implemented pharmacy agreements, ensured regulatory compliance, and managed operational and financial performance. (*Id.*) Outside of Cardinal, Mr. Moore has served as a pharmacy manager and pharmacy specialist, was a President of a hospital pharmacy consulting company, and is currently the Director of Internal Resources for PharMercia, "the second largest company in the institutional pharmacy services market," and serves on the Louisiana Board of Pharmacy, Congressional District 6. (*Id.* at 2–4.)

Importantly, however, while Mr. Moore was at Cardinal, he did not oversee activities in Arizona, did not have experience with Mayo, and did not "have any role with respect to Cardinal's inventory of heparin at its distribution centers in 2007 and 2008." (Doc. 149-2 at 25.) Therefore, Mr. Moore's experience does not adequately resolve the reliability issues in his analysis.

### e.  Conclusion

Mr. Moore's opinions regarding product identification are unreliable under *Daubert*, given that his analysis of the turnaround times is speculative, his analysis fails to satisfy the *Daubert* factors, and his presentation of data suggests a cherry-picked

methodology. Therefore, his expert opinion on product identification, in particular his conclusion that Dr. Allen received contaminated Baxter heparin due to the time periods that Cardinal and Mayo held onto particular lots of heparin, is excluded.

Given his extensive experience and expertise, however, this ruling does not preclude Mr. Moore from testifying, without prejudice to future evidentiary objections, as to: (1) industry practice with regard to NDC numbers and the sale, shipment, and inventory of drugs at wholesalers and end users; (2) which lot numbers Cardinal received from Baxter; (3) the NDC numbers on the heparin purchased by Cardinal and Mayo; (4) the meaning of the NDC numbers, by explaining how the numbers describe the manufacturer, drug type and dosage, and form of packaging; and (5) the NDC numbers in the MedAltID fields for the doses given to Dr. Allen, including his explanation as to why the 6:00 a.m. and 10:15 a.m. doses were not definitively produced by APP.

## B. Causation Experts

The experts discussed below provide testimony on both general and specific causation. General causation testimony bears on whether "a particular stimulus [is] known to produce a particular reaction," while specific causation testimony bears on whether "a particular stimulus cause[d] a particular consequence in a specific instance." Fed. Judicial Ctr. & Nat'l Research Council, *Reference Manual on Scientific Evidence* xiv (3d ed. 2011).

### 1. Defendants' Causation Expert

Plaintiffs make two challenges to Defendants' causation expert witness, Dr. Dan James Fintel. First, Plaintiffs aver that Dr. Fintel should be prohibited, under *Daubert* and Rule 702, from testifying as to the specific cause of Dr. Allen's injuries and death, because his methodology is unreliable. (Doc. 148 at 1.) Second, Plaintiffs claim that Dr. Fintel should not be allowed to present "general opinions regarding contaminated heparin," because this opinion was not disclosed in his expert report, he is not qualified to offer this opinion, and his opinion is unreliable. (*Id.* at 1–2, 4.)

**a. Dr. Allen's Injuries and Death**

Plaintiffs do not claim that Dr. Fintel is unqualified to give testimony on the cause of Dr. Allen's injuries or death or that such testimony would not fit the case. Rather, Plaintiffs contend that Dr. Fintel's proposed testimony regarding Dr. Allen's injuries and death is unreliable because Dr. Fintel failed to perform a reliable differential diagnosis. (Doc. 148 at 6.)

**i. Dr. Fintel's Qualifications**

Dr. Fintel's qualifications are relevant to the reliability analysis, despite being unchallenged, because they establish his medical training and experience, which bear on the reliability of his medical opinions. Dr. Fintel holds a B.S. in Molecular Biophysics & Biochemistry from Yale College and an M.D. from Harvard Medical School and the Massachusetts Institute of Technology. (Doc. 154-2 at 2.) He did his residency in Medicine at Mount Sinai Hospital in New York City, New York and his fellowship in Cardiology at Johns Hopkins Medical Institutions in Baltimore, Maryland. (*Id.*) Since 1985, Dr. Fintel has worked as a cardiologist at Northwestern Memorial Hospital and has taught various courses in medicine at Northwestern University Feinberg School of Medicine, both located in Chicago, Illinois. (*Id.* at 3.) Since 1992, Dr. Fintel has been the Director of the Coronary Care Unit at Northwestern Memorial Hospital. (*Id.*) At the hospital, Dr. Fintel attends the coronary care unit and the observation unit, performs outpatient consults, reads EKGs, and interprets nuclear scans. (Doc. 148-5 at 5.) In addition to his experience as a practicing cardiologist and as a professor, Dr. Fintel has published books, chapters, monographs, and papers and has worked as a principal investigator on research projects, all with a focus on cardiology, and some of which focus on anticlotting and antiplatelet agents. (Doc. 154-2 at 6–20.) Dr. Fintel maintains board certifications in internal medicine, cardiovascular disease, and nuclear cardiology. (Doc. 148-5 at 5.)

**ii. Dr. Fintel's Differential Diagnosis**

A differential diagnosis is a two-step process by which physicians compile and

analyze potential sources of a patient's adverse condition. *See Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003). Generally, a properly performed "differential diagnosis is admissible under *Daubert*." *Id.* In the first step, the physician produces a "comprehensive list" of possible sources for the patient's malady. *Id.* at 1057–58. In the second step, the physician evaluates the list and uses evidence and "scientific methods and procedures" to rule out unviable hypotheses. *Id.* Utter failure to explain why the expert ruled out a possible alternative cause, or basing an opinion on "subjective belief or unsupported speculation," makes the opinion unreliable. *Id.* at 1061; *see Heck v. City of Lake Havasu*, No. CV 04-1810-PCT-NVW, 2006 WL 2460917, at *7–8 (D. Ariz. Aug. 24, 2006) (holding unreliable a differential diagnosis that provided no "scientific explanation for ruling out any alternative causes of death."). However, failure to rule out every possible alternative cause is not required. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999). A physician's failure to rule out the entire possible universe of sources of an individual's malady goes to the weight the jury gives the testimony, and not to the admissibility of the expert's opinion. *See id.*; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (noting alternative measures to exclusion for "shaky" expert testimony). Ultimately, medical diagnosis is often uncertain, given the complexities of the human body, the innumerable sources of disease and injury, and the difficulties in performing properly-structured clinical studies (particularly those involving contaminated drugs). *See United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006); *see also Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014); *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). Therefore, when a doctor offers a reasonable medical opinion, grounded in their relevant experience, appropriate analysis, and in the medical literature, their opinions should not be excluded. *See Messick*, 747 F.3d at 1199; *see also Primiano*, 598 F.3d at 565–66 (highlighting the importance of relevant experience in evaluating the reliability of medical expert testimony).

First, Plaintiffs claim that Dr. Fintel's differential diagnosis failed to truly take into

account the possibility that contaminated heparin caused Dr. Allen's injuries and death. (Doc. 148 at 7–12.)  In support of this claim, Plaintiffs aver that: (1) Dr. Fintel did not address contaminated heparin during his deposition until prompted by Defense counsel after a break, despite Plaintiffs' counsel asking about his differential diagnoses of hypotension, clotting, and telemetry alarms, (*id.*); (2) Dr. Fintel admitted that heparin was "extremely low" in his differential, (*id.* at 10); and (3) Dr. Fintel's report does not even mention contaminated heparin, (*id.* at 10–11.)  Ultimately, Plaintiffs argue, Dr. Fintel pre-judged the cause of Dr. Allen's death and believed that Dr. Allen had a heart attack prior to coming to the hospital, and thus failed to take seriously the possibility of contaminated heparin.  (*Id.* at 8, 11.)

As an initial matter, the Court disagrees with Plaintiffs' characterization of the deposition record.  During examination by Plaintiffs' counsel, prior to any break, Dr. Fintel expressly testified that Dr. Allen's heart attack was "not caused by any physician or medicine," but rather by preexisting issues with Dr. Allen's heart exemplified by rising enzyme levels indicating that heart damage occurred "before any subsequent IV heparin administration."   (Doc. 148-5 at 20–21.)   This testimony indicates that Dr. Fintel's differential diagnosis ruled out heparin, contaminated or otherwise, because he saw signs of the source of Dr. Allen's adverse condition before heparin was ever administered.

Additionally, Defense counsel allegedly prompting Dr. Fintel to discuss heparin does not make the doctor's methodology unreliable so long as his underlying differential diagnosis still appropriately considered heparin.  Dr. Fintel discussed his exclusion of heparin as a source of Dr. Allen's injuries and death in lengthy and particular detail. Importantly, Dr. Fintel testified that there was no indication in the medical record that Dr. Allen suffered from allergic or anaphylactoid reactions, which he claims are indicative of contact with contaminated heparin based upon his review of two relevant studies.  (*Id.* at 34.)  Additionally, Dr. Fintel testified that prior to the administration of heparin: (1) Dr. Allen's electrocardiogram was highly abnormal; (2) Dr. Allen's enzyme levels indicated "significant myocardial injury"; and (3) Dr. Allen's telemetry monitoring showed results

"clearly consistent with acute myocardial injury." (*Id.* at 35.)  Furthermore, Dr. Fintel testified that: (1) the post-mortem heart exam showed "clear evidence of coronary artery disease," because the left anterior descending coronary artery ("LAD") had "Grade 3 out of 4 stenosis"; (2) the angiogram showed that the LAD and "left circumflex" were "full of blood clot consistent with the areas of acute vessel injury"; (3) Dr. Allen had symptoms, "some of which may have been GI [gastrointestinal], but many of which were likely cardiac systems being attributed to the GI symptoms"; and (4) a chest X-ray was "consistent with some degree of left ventricular dysfunction due to interstitial edema." (*Id.*)  Taken together, Dr. Fintel concluded that this "overwhelming body of data," which he interpreted in light of his thirty years as a cardiologist and regular treatment of heart attacks, indicated that "this was clearly a case of evolving myocardial infarction that was in place before any exposure to any heparin medication." (*Id.*)  Given Dr. Fintel's analysis, he clearly considered, and ruled out, contaminated heparin as a potential source of Dr. Allen's condition.

Plaintiffs contend that Dr. Fintel's statement that heparin was "extremely low" on his differential diagnosis makes his opinion unreliable.  Differential diagnosis, however, necessitates that the physician rank some potential sources of the patient's condition higher than others.  Dr. Fintel provided sufficient reasoning, as described above, as to why he thought heparin was an unlikely source for Dr. Allen's condition; therefore, it follows that Dr. Fintel would rank contaminated heparin towards the bottom in his differential diagnosis.

Finally, the fact that Dr. Fintel's report does not include the phrase "contaminated heparin" does not make his opinion unreliable.  Dr. Fintel's report notes that Dr. Allen's enzyme levels indicated that he was having a heart attack "well before he received any heparin," that Dr. Allen did not "experience an anaphylactoid reaction" after the bolus doses, and that Dr. Allen's injuries and death were caused by a heart attack and "were not caused by the administration of heparin." (Doc. 148-4 at 4–5.)  Dr. Fintel mentioned heparin four times in his report.  The initial reference and last reference refer to both

uncontaminated and contaminated heparin, because Dr. Allen could not have been given contaminated heparin if he was never given any heparin. The references to anaphylactoid shock solely refer to contaminated heparin, because that reaction is, as Dr. Fintel testified, indicative of contaminated heparin and not uncontaminated heparin. Therefore, Dr. Fintel's report properly discussed the potential effects of contaminated heparin in this case, despite not actually using the word contaminated.

Second, Plaintiffs argue that Dr. Fintel was incorrect in stating that there was no "immediate hypotension" after the administration of heparin and that Dr. Fintel's analysis did not take into account three known side effects of contaminated heparin: clotting, vomiting, and HIT. (Doc. 148 at 12.) As an initial matter, Plaintiffs' argument attempts to restructure the differential diagnosis process. In performing a differential diagnosis, the physician is examining the patient's entire condition over a period of time, and is not performing a differential diagnosis for each individual symptom. Therefore, failure to consider all possible sources for each individual symptom, when the physician has, using his medical training, professional experience, and a holistic analysis of the patient's medical presentation, ruled out a potential cause of the patient's malady, does not make his opinion unreliable. Dr. Fintel, as discussed above, ruled out contaminated heparin as source of Dr. Allen's condition, and thus his alleged failure to perform a differential diagnosis on each symptom would not render his opinion unreliable. Even so, Dr. Fintel appropriately addressed each of these individual symptoms.

The parties dispute whether the MDL court held that Dr. Allen was hypotensive eleven minutes after administration of heparin. *Compare* (Doc. 148 at 12), *with* (Doc. 154 at 14 n.2.) Defendants contend that the MDL court was ruling on Defendants' motion for summary judgment, and as such construed all evidence, including the background, in the favor of the opposing party. (Doc. 154 at 14 n.2.) This Court agrees with Defendants. The MDL court stated that it "accept[ed] the non-movant's [Plaintiffs'] evidence as true and construe[d] all evidence in its favor." *In re: Heparin Prods. Liab. Litig.*, No. 1:10HC60098, 2016 WL 2868684, at *3 (N.D. Ohio May 17, 2016). This

conclusion is further supported by the MDL court adopting Plaintiffs' expert's opinion regarding hypotension without citing or distinguishing Defendants' witness's contrary opinion that was before it in a sealed exhibit at that time. *See* (Doc. 151-23 at 72 (unsealed) (noting that Dr. Fortuin did not believe that Dr. Allen was hypotensive eleven minutes after heparin administration.)) Therefore, because the MDL court was applying the deferential summary judgment inferences, it did not hold that Dr. Allen became hypotensive at a particular time, and the law of the case does not apply.

Furthermore, Dr. Fintel did provide an opinion on what caused Dr. Allen's ultimate hypotension. Dr. Fintel testified that pharmacological mechanisms and mechanical mechanisms contributed to Dr. Allen's hypotension. (Doc. 148-5 at 19.) The pharmacological mechanisms included intracoronary nitroglycerine, intracoronary Verapamil, and fentanyl, all of which can lower blood pressure. (*Id.*) The mechanical mechanisms included blood rushing to an ischemic, or previously deprived, area of the heart, which can result in either hypo- or hypertension, and pre-heparin damage to the heart—as indicated by the pre-heparin EKG— which could have caused parts of the heart muscle to die, thus lowering blood pressure. (*Id.*) Therefore, Dr. Fintel's opinion on hypotension cannot be used to attack the reliability of his differential diagnosis.

Plaintiffs contend that Dr. Fintel failed to mention clotting as a symptom of contaminated heparin and failed to mention that clotting was a sign when he concluded that he saw "no evidence" of the signs of heparin contamination. (Doc. 148 at 12.) Contrary to Plaintiffs' characterization, Dr. Fintel did mention clotting as one of the potential symptoms of heparin contamination, noting that he "was aware of some degree of increased clotting," but that he was not "a hematologist" so he "defer[red] to hematologists who will testify on that issue." (Doc. 148-5 at 9.) Furthermore, Dr. Fintel did discuss clotting in some detail, and ultimately concluded that he believed that the clotting was related to Dr. Allen's preexisting heart condition. (Doc. 148-5 at 20–21, 26.) Dr. Fintel expressly addressed some of Plaintiffs' experts' findings with regard to clotting, stating that there was no significance to the color of the clot. (*Id.* at 26.)

Therefore, allegations regarding clotting do not weaken the reliability of Dr. Fintel's testimony.

Plaintiffs argue that Dr. Fintel did not appropriately rule out HIT as a symptom of contaminated heparin in performing his differential diagnosis. (Doc. 148 at 12–13.) Dr. Fintel, however, noted that "[h]ematologic abnormalities [due to contaminated heparin] can include an early development of . . . HIT . . . within the first day or so shortly thereafter following exposure to the drug." (Doc. 145-5 at 9.) Later in his deposition, Dr. Fintel testified that Dr. Allen's development of HIT occurred sixteen days after his initial exposure to heparin, which was "certainly consistent with the repeated exposures to heparin he [Dr. Allen] required during the course of his surgery." (*Id.* at 36.) Dr. Fintel's statements, taken together, show that he ruled out contaminated-heparin-induced thrombocytopenia due to the time lapse between exposure to heparin and the onset of symptoms. Plaintiffs further contend that the MDL court ruled that contaminated heparin can result in onset of HIT over a longer period. (Doc. 148 at 12–13.) The MDL court, however, did not hold that contaminated heparin causes HIT over a longer period, but rather, applying the summary judgment standard, found that Plaintiffs had presented sufficient evidence to establish a genuine dispute of material fact on this issue. *In re Heparin Prods. Liab. Litig.*, 803 F. Supp. 2d 712, 754 (N.D. Ohio 2011). Therefore, Dr. Fintel's disagreement with Plaintiffs' experts on the issue of HIT does not affect the reliability of his opinion.

Plaintiffs claim that Dr. Fintel did not rule out vomiting blood as a sign of contaminated heparin. (Doc. 148 at 13.) Dr. Fintel, however, discussed vomiting blood, which he believed to be from "a tear in the esophagus due to forceful vomiting" due to being nauseous, having a heart attack, and having medical procedures performed. (Doc. 148-5 at 45.) Plaintiffs note that vomiting "may" be a symptom of contaminated heparin, (Doc. 148 at 13), but Dr. Fintel offered an alternative cause of vomiting based on his own medical analysis. Therefore, Dr. Fintel's opinion is not unreliable in this regard.

Finally, Plaintiffs claim that Dr. Fintel's opinion is unreliable because he failed to

consider concurrent causes for Dr. Allen's condition. (*Id.* at 13.) Plaintiffs argue that Dr. Fintel failed to consider whether contaminated heparin caused or contributed to Dr. Allen's heart attack or prevented him from recovering, making his opinion unreliable. (*Id.* at 14.) Dr. Fintel, however, did rule out contaminated heparin as a contributing factor to Dr. Allen's death by remarking that he did not see any anaphylactoid reaction, which to him, based upon a review of the scientific literature, indicated that Dr. Allen was not experiencing any adverse reactions from contaminated heparin at all. (Doc. 148-5 at 45.)

Dr. Fintel's opinions regarding Dr. Allen's injuries and death are reliable. Plaintiffs' criticisms of his methodology are more appropriately suited for attacking the weight of his testimony at trial rather than its admissibility.

### b. Dr. Fintel's General Causation Opinions on Contaminated Heparin

Plaintiffs argue that Dr. Fintel should not be permitted to provide general causation opinions on contaminated heparin as it would violate the expert disclosure requirement, the area is outside his expertise, and his opinion is unreliable. (Doc. 148 at 15.)

Plaintiffs contend that Dr. Fintel's expert report concluded that Dr. Allen's condition was caused by a heart attack and not heparin, but did not offer broader explanations of the effects of contaminated heparin. (*Id.*) Rather, Plaintiffs aver, Dr. Fintel only discussed the effects of contaminated heparin after Defense counsel examined him, and expressed opinions "that contaminated heparin has not been established to cause death; that to his knowledge contaminated heparin has not been established to cause organ failure; and that contaminated heparin has not been 'conclusively established to cause myocardial infarctions.'" (*Id.*) Plaintiffs contend that this violates Federal Rule of Civil Procedure 26 ("Rule 26"). (*Id.* at 15–16.)

Generally, Rule 26 requires that a testifying expert witness provide a signed report containing, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them," and "the facts or data considered by the

witness in forming them." Fed. R. Civ. P. 26(a)(2)(B). This requirement is meant to reduce the length of, or eliminate the need for, expert depositions. Fed. R. Civ. P. 26(a)(2)(B) advisory committee's note to 1993 amendment. Failure to comply with this disclosure prevents a party from using the expert's non-disclosed testimony "on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). The burden is on the party seeking to avoid sanctions to show that either of the exceptions applies. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). In deciding whether this burden has been met, this Court has a particularly wide range of discretion. *Id.* at 1106.

Dr. Fintel's expert report does not disclose any opinion on general causation with regard to the effects of contaminated heparin. (Doc. 148-4.) Rather, he references heparin four times, without discussing contamination, and notes that he based his opinion, in part, on the two leading studies concerning the effects of contaminated heparin. (*Id.*) One would have to have specialized extra-textual knowledge to interpret Dr. Fintel's report as discussing general causation with regard to contaminated heparin. Therefore, the report does not constitute "a complete statement" providing "the basis and reasons" for Dr. Fintel's opinion on general causation.

Plaintiffs ask for parity on this issue, arguing that the parties made an agreement prohibiting one of Plaintiffs' specific causation experts, Dr. Michael Gorton, from testifying on general causation because such opinions were not disclosed in his report. (Doc. 158 at 8–9.) During Dr. Gorton's deposition, Defense counsel asked whether he would be explaining how contaminated heparin works or whether he would be deferring to other experts on that issue. (Doc. 158-36 at 187.) Dr. Gorton replied "I think a combination of both." (*Id.*) Defense counsel then noted that Dr. Gorton did not disclose such general causation opinions in his report and requested an opportunity to reopen the deposition at a later date because she was "not prepared to ask" Dr. Gorton "all of [the Defense's] general causation questions." (*Id.* at 188.) Counsel for both parties then agreed to discuss the issue off the record. (*Id.*) The parties came back on the record six

minutes later, and agreed that Mr. Kieffer, Plaintiffs' counsel, would make a statement on the record setting forth their agreement. (*Id.*)  In this statement, Mr. Kieffer explained that Plaintiffs intended to rely on other experts for descriptions of general causation, but that Dr. Gorton has "an understanding of the subject-matter" and his opinions "may touch on" general causation. (*Id.* at 189.)  Ms. Watral, Defense counsel, then clarified that the Defense understood that Dr. Gorton would not be testifying beyond the boundaries of his report, including on the general mechanisms of contaminated heparin and on materials that Dr. Gorton indicated that he reviewed, but which he did not actively discuss in his report. (*Id.* at 189–90.)  Mr. Kieffer disagreed with Ms. Watral's characterization of their agreement, noting that Ms. Watral had asked Dr. Gorton about matters not described in his report and further expressed that "anything" that Dr. Gorton listed as relying on in his report "is fair game in terms of things his testimony might touch on." (*Id.* at 190.)  Mr. Kieffer noted that he did not expect Dr. Gorton to "give a dissertation" about the referenced, but undiscussed, materials, but that he could be expected to mention them in testimony. (*Id.* at 191.)  Ending this discussion, Ms. Watral agreed: "Okay.  And so long as what he's touching on is within his report, then I think we are in agreement." (*Id.* at 191–92.)

Dr. Fintel and Dr. Gorton are in substantially similar situations.  Both doctors have extensive experience dealing with heart attack patients and in overseeing the administration of heparin, both doctors' reports disclose that they reviewed the scientific literature on this topic, and both doctors, in response to questioning, gave opinions on the general causal mechanisms of contaminated heparin not previously disclosed in their reports.  It would not be harmless to permit Dr. Fintel—an expert witness for the Defense—to testify on general causation issues that the similarly situated Dr. Gorton is prohibited from discussing upon Defense counsel's demand.  Therefore, Dr. Fintel's general causation opinion is excluded under Federal Rule of Civil Procedure 37(c)(1) to the extent that it goes beyond the agreement reached between the parties with respect to Dr. Gorton's general causation testimony.

## 2. Plaintiffs' Causation Experts

Defendants make three challenges to the admissibility of testimony by Plaintiffs' causation experts: Dr. Anthony Magalski, Dr. Michael Gorton, Dr. Joseph Kiss, and Dr. Walter Jeske. (Doc. 151 at 1.) First, Defendants argue that these experts' general causation testimony is unreliable and thus inadmissible. (*Id.* at 26–28.) Second, Defendants contend that this Court should exclude these experts' testimony on specific causation as unreliable. (*Id.*) Third, Defendants contend that Drs. Kiss, Jeske, and Gorton lack the necessary qualifications to render certain opinions. (*Id.* at 25–26.)

### a. Qualifications

Because all of these experts provide opinions based, in part, upon their professional qualifications and experience, a review of their professional history is in order.

Dr. Magalski holds his M.D. from Washington University School of Medicine in St. Louis, Missouri and completed his residency and his fellowship in Adult Cardiology at the University of Texas Southwestern Medical School, Parkland Memorial Hospital/Dallas Veterans Administration Medical Center in Dallas, Texas. (Doc. 151-14 at 2.) He is board certified in Adult Congenital Heart Disease, Advanced Heart Failure and Transplant Cardiology, Cardiovascular Disease, and Echocardiography. (*Id.*) Dr. Magalski is a Fellow of the American College of Cardiology and is a professor at the University of Missouri-Kansas City School of Medicine. (*Id.* at 3.) He has published extensively in scientific journals and has participated in numerous clinical trials. (*Id.*) Professionally, Dr. Magalski has "participated in the medical care of more than 10,000 patients that have experienced acute myocardial infarction," is "familiar with the medical causes, medical complications, and treatments that are associated with acute myocardial infarction," and "is experienced in the recognition, diagnosis and treatment of patients suffering from acute myocardial infarction." (*Id.*)

Dr. Gorton holds an M.D. from the University of Kansas School of Medicine in Kansas City, Kansas, performed his General Surgery residency at Iowa Methodist

Medical Center, and completed his cardiothoracic fellowship at Mid America Heart Institute of Kansas City, Missouri. (Doc. 151-15 at 2.) He became a staff member and partner at Mid America Heart Institute and performed over 1,000 open heart procedures per year in that role. (*Id.*) Subsequently, Dr. Gorton joined the University of Kansas Medical Center as Director of Cardiovascular Surgery, drastically increasing the number of open heart procedures performed there per year. (*Id.* at 3.) Dr. Gorton is currently in private practice at Liberty Hospital in Liberty, Missouri where he maintains a full-time practice in open heart, vascular, and thoracic surgery. (*Id.*) He is board certified in general surgery and thoracic surgery, is involved in many professional and academic societies, including the American College of Surgeons, and has published extensively. (*Id.*) Dr. Gorton has used "systemic intravenous heparin anticoagulation" in "every one of the more than 5,000 open heart procedures" that he has performed and has "personally seen and treated multiple cases of" HIT. (*Id.*) Dr. Gorton has treated over 5,000 patients who have suffered from acute myocardial infarction. (*Id.*) Finally, Dr. Gorton is "familiar with the medical causes, medical complications, and treatments that are associated with acute myocardial infarction" and is "experienced in the recognition, diagnosis, and treatment of patients suffering from acute myocardial infarction." (*Id.*)

Dr. Kiss is a board certified internist and hematologist and a Professor of Medicine at the University of Pittsburgh. (Doc. 151-16 at 2.) Additionally, he serves as the Medical Director for Hemapheresis and Blood Services at the Institute for Transfusion Medicine. (*Id.*) He has subspecialty certifications in internal medicine, transfusion medicine, hematology, and oncology. (*Id.*) In his professional and academic capacities, Dr. Kiss strongly focuses on coagulation. (*Id.*) He sees patients in outpatient settings, lectures on platelet physiology disorders, rounds as a consultant hematologist with hematology, internal medicine trainees, and medical students, and teaches coagulation on a weekly basis using patient histories and coagulation laboratory test profiles. (*Id.*) He is frequently consulted by physicians, including hematologists, "regarding patients with unusual and/or challenging coagulation/bleeding disorders, including" HIT. (*Id.* at 2–3.)

Dr. Kiss has been engaged in these activities for over twenty-five years. (*Id.* at 3.)

Dr. Jeske holds a B.S. in Biochemistry from Illinois Benedictine College and a Ph.D. in Pharmacology from Loyola University Chicago. (Doc. 151-17 at 2.) His dissertation "dealt with the comparative pharmacology of synthetic heparin analogs having specific interaction with either antithrombin or heparin cofactor II." (*Id.*) Dr. Jeske performed post-doctoral work at the Cardiovascular Institute at Loyola University Medical Center focusing on "platelet analysis techniques and their application to" HIT. (*Id.*) Recently, Dr. Jeske's work with heparin has "related to evaluating the comparative pharmacology of generic or biosimilar low molecular weight heparins with the idea of understanding how to properly define biosimilarity." (*Id.*) He has worked on published studies that were "designed to examine the impact of the heparin contaminant on the hemostatic effects of unfractioned and low molecular weight heparins" and was part of a group that "isolated and characterized" OSCS. (*Id.* at 2–3.)

### b. General Causation Reliability

Defendants argue that all four causation experts should be precluded on reliability grounds from providing general causation opinions that contaminated heparin is capable of causing myocardial infarction, cardiogenic shock, cardiac injuries, and death. (Doc. 151 at 27–29.)

First, Defendants argue that because Dr. Kiss admitted that no epidemiological studies, authoritative texts, or expert bodies have established a correlation between contaminated heparin and cardiogenic shock and myocardial infarction, any expert opinion suggesting such a correlation is unreliable. (Doc. 151 at 27.) Defendants, however, do not recognize the potential chain of events leading to cardiogenic shock and myocardial infarction. The MDL court found that Plaintiffs "have produced credible scientific evidence that contaminated heparin can increase the risk of HIT" and presented "reliable expert testimony that contaminated heparin can cause bleeding and clotting complications." *In re Heparin Prods. Liab. Litig.*, 803 F. Supp. 2d 712, 754 (N.D. Ohio 2011). Additionally, a retrospective CDC study supports the view that contaminated

heparin can cause hypotension. David B. Blossom et al., *Outbreak of Adverse Reactions Associated with Contaminated Heparin*, 359 New Eng. J. Medicine 2674, 2675 (2008). Plaintiffs' experts ultimately reported that they believed that contaminated heparin unleashed a cascade of symptoms by first causing HIT, clotting issues, and hypotension, which then caused myocardial infarction and cardiogenic shock. *See* (Doc. 151-14 at 13 (Dr. Magalski reporting that "[t]his clinical picture of severe and persistent hypotension is consistent with the known vasodilatory effects of contaminated heparin via activation of the kinin-kallikrein system and almost certainly contributed to the development of multi-system organ failure"); Doc. 151-15 at 13 (Dr. Gorton reporting that "bolus heparin directly caused unexpected and increased clotting, and severe hypotension that led to cardiogenic shock"); Doc. 151-16 at 4 (Dr. Kiss reporting that HIT "can result in thrombotic events including pulmonary embolism, myocardial infarction, and strokes.")) Therefore, Plaintiffs' experts can reliably testify that contaminated heparin can cause myocardial infarction and cardiogenic shock.

Second, Defendants contend that because Dr. Kiss admitted that there were no studies on the effects of contaminated heparin on cardiac patients, Plaintiffs' experts are precluded from testifying that contaminated heparin causes adverse effects in cardiac patients. (Doc. 151 at 28.) These experts are not required to show the same symptoms in cardiac patients for their methodology to be reliable. This is particularly true where recall prevents comprehensive retrospective analysis and ethical concerns prevent prospective clinical testing, which is the case here. Additionally, Defendants do not describe how the biological mechanism triggered by contaminated heparin differs in cardiac patients as opposed to the patients in the published research. Thus, Plaintiffs' experts can reliably testify that contaminated heparin can cause adverse effects in cardiac patients.

Third, Defendants contend that Dr. Kiss's admission that no studies found an association between contaminated heparin and death precludes Plaintiffs' experts from testifying that contaminated heparin can cause death. (Doc. 151 at 28.) As discussed

above, Plaintiffs' experts set forth a chain of reasoning, explaining how OSCS exposure can result in myocardial infarction and cardiogenic shock, both of which can result in death. Therefore, Plaintiffs' experts can reliably testify that contaminated heparin can cause death.

### c. Specific Causation Reliability

Defendants challenge as unreliable Plaintiffs' experts' specific causation opinions, arguing that their methodology is unreliable, their testimony contradicts medical records and treating physician testimony, they failed to consider contrary scientific evidence, and they provide improper narrative opinions. (*Id.* at 18–24.)

### i. Unreliable Methodology

Defendants make two arguments as to why Plaintiffs' causation experts lack a reliable methodology for determining specific causation.

First, Defendants argue that these experts' methodology conflicts with the MDL court's rulings. (*Id.* at 16.) Specifically, Defendants claim that these experts indicated that the 6:00 a.m. subcutaneous dose and the 10:15 a.m. bolus dose of heparin could have been contaminated, leading to Dr. Allen's symptoms, which contradicts the MDL court's ruling that these doses could not have been contaminated Baxter heparin. (*Id.*) Therefore, Defendants conclude that Plaintiffs' experts are utilizing an unreliable methodology that produces false positives in that they find the possibility of contaminated Baxter heparin where there is none. (*Id.*)

As discussed above, this Court will not follow the MDL court's ruling that the 10:15 a.m. dose could not have been Baxter heparin. Therefore, Plaintiffs' causation experts' opinions are not weakened by their conclusions that the 10:15 a.m. dose could have been contaminated Baxter heparin that triggered Dr. Allen's symptoms.

The MDL court held, and Plaintiffs do not challenge, that non-bolus doses— subcutaneous doses and drip doses—have not been shown to cause the injuries associated with OSCS contamination. *In re Heparin Prods. Liab. Litig.*, 803 F. Supp. 2d 712, 754–55 (N.D. Ohio 2011). Rather, Plaintiffs argue that their experts did not rely on the 6:00

a.m. dose to conclude that OSCS contaminated caused Dr. Allen's symptoms. (Doc. 155 at 23–24.) Defendants counter that it is irrelevant whether the experts rely on the 6:00 a.m. dose in reaching their ultimate conclusion. (Doc. 160 at 10.) Instead, Defendants claim, the mere fact that the experts' methodology indicated that the 6:00 a.m. dose could have caused Dr. Allen's symptoms indicates a false positive, eroding the reliability of that methodology. (*Id.*) A closer analysis of the experts' opinions is necessary to determine whether their methodologies produce false positives.

In his expert report, Dr. Magalski testified that Dr. Allen's second set of cardiac enzymes were modestly elevated following the administration of the 6:00 a.m. subcutaneous dose. (Doc. 155-3 at 12.) Dr. Magalski determined that this could be from OSCS-contaminated heparin or from "acute medical noncardiac illness (i.e., his gastrointestinal illness)." (*Id.*) At his deposition, however, Dr. Magalski clarified that he would not be testifying that it was more likely than not that contaminated heparin provided at 6:00 a.m. resulted in Dr. Allen's elevated cardiac enzyme-levels, (Doc. 151-35 at 105), but rather that it was a "less likely" cause than the gastrointestinal issues, (*Id.* at 104.)

Similarly, Dr. Gorton opined in his expert report that either the subcutaneous dose or gastrointestinal illness accounted for the rise of Dr. Allen's cardiac enzymes. (Doc. 151-15 at 6.) Like Dr. Magalski, Dr. Gorton noted in his deposition that "he can't render an opinion one way or the other whether" Dr. Allen suffered from adverse reactions from the subcutaneous dose and agreed that he could not say "it is more likely than not that Dr. Allen suffered from an adverse reaction as a result of the subcutaneous dose." (Doc. 151-36 at 58–59.)

Dr. Kiss testified that he could not "say one way or the other whether the subcutaneous heparin" Dr. Allen received "was contaminated." (151-27 at 11.) Dr. Jeske did not opine on whether the subcutaneous dose was contaminated.

Drs. Magalski, Gorton, and Kiss, unlike Dr. Jeske, opine that there is a possibility that the 6:00 a.m. subcutaneous dose possibly resulted in an adverse event. This

constitutes a false-positive, in that the experts' methodology produced a result in conflict with the MDL court's holding that subcutaneous doses are not associated with OSCS-contaminated heparin adverse events. Therefore, the reliability these doctors' opinions is weakened.

Dr. Kiss further testified that "maybe the subsequent drip infusion may have contained – likely contained contaminated heparin." (*Id.*) As noted above, the MDL court has determined that such non-bolus doses have not been shown to cause OSCS-related symptoms, and thus the reliability of Dr. Kiss's opinion is weakened due to his methodology producing a false-positive.

Second, Defendants contend that these experts' opinions are unreliable because there is no evidence that contaminated heparin can cause "several of the symptoms" Plaintiffs' experts "attribute to heparin" and Plaintiffs' experts concede that Dr. Allen's symptoms are consistent with uncontaminated heparin. (Doc. 151 at 18.) As discussed above, Plaintiffs' experts can appropriately testify that Dr. Allen's symptoms are attributable to contaminated heparin. As for the alleged concessions, Defendants cite the following examples of Drs. Kiss, Magalski, and Gorton admitting that the following symptoms can occur without exposure to contaminated heparin:

- anaphylactoid reactions (Ex. 26, Kiss Dep. at 114);
- clotting, including clotting in two vessels, supposedly "unusual clotting like Dr. Allen," and "difficulty removing clots" (Ex. 26, Kiss Dep. at 49, 54, 56; Ex. 34, Magalski Dep. at 62; *see* Ex. 35, Gorton Dep. at 10);
- bleeding (Ex. 34, Magalski Dep. at 62);
- myocardial infarction (Ex. 26, Kiss Dep. at 49; Ex. 34, Magalski Dep. at 60);
- cardiogenic shock (Ex. 26, Kiss Dep. at 77–78);
- hypotension (Ex. 26, Kiss Dep. at 56; *see also* Ex. 26, Kiss Dep. at 157–58, 163–64 (noting that Dr. Allen's alleged hypotension could be explained by non-contamination reasons and thus "doesn't fit within the classical CDC case definition"); Ex. 34, Magalski Dep. at 71; Ex. 35, Gorton Dep. at 16); and
- HIT (Ex. 26, Kiss Dep. at 56–57, 96, 141; Ex. 34, Magalski Dep. at 169; Ex. 35, Gorton Dep. at 236).

(*Id.*)

As noted above, a differential diagnosis involves a holistic analysis of the patient's presentation to rule in, and then whittle down, possible sources of his or her maladies. Plaintiffs' experts clearly engaged in this sort of appropriate holistic differential diagnosis. Dr. Magalski testified that he was "looking at the entire picture" in performing his analysis, and believed contaminated heparin to be the likely source of Dr. Allen's symptoms due to his low risk factors for heart attack, the near temporal proximity of the administration of heparin and the onset of symptoms, and the presence of clots in multiple arteries, which Dr. Magalski had not seen in his "21 years as a cardiologist taking care of thousands of patients who've had a heart attack." (Doc. 151-35 at 85–86.) Dr. Gorton testified that given his review of the entire record and the "adverse events" that Dr. Allen suffered, in combination with his "25 to 30 years of clinical experience seeing over 5,000 patients" that have had various forms of heart attacks, he had a "hard time explaining" Dr. Allen's condition if he was not given contaminated heparin. (Doc. 151-36 at 59.) Finally, Dr. Kiss testified that his analysis of the "totality" of the case "make[s] it highly consistent or highly suggestive that something external to the typical cardiac case could cause clots like this." (Doc. 151-27 at 51.) These experts appropriately considered Dr. Allen's symptoms holistically rather than individually.

Defendants citation to *Tamraz v. Lincoln Electric Co.* is inapposite. In *Tamraz*, the court of appeals ruled that the district court erred in admitting the expert testimony of a physician who testified that the plaintiff had "manganese-induced parkinsonism." 620 F.3d 665, 667 (6th Cir. 2010). The expert had to engage in three leaps of speculation in making the general causation determination that exposure to manganese, a material similar to iron, can cause Parkinson's Disease and an additional speculative leap to make the specific causation determination that manganese exposure caused Parkinson's Disease in the plaintiff. *Id.* at 670–71. Key to the *Tamraz* court's decision was this "string" of speculation. *Id.* at 672. Defendants do not identify how Plaintiffs' experts in this case engage in a chain of speculation rather than engaging in the single act of

speculation that is attendant to all medical diagnoses—finding that a hypothesized source of injury is more likely than another based upon a holistic assessment of the patient.

Defendants argue that Dr. Kiss's admission that published literature did not contain any methodology for distinguishing between symptoms caused by contaminated heparin and other sources makes his opinion unreliable. (Doc. 151 at 19.) But Dr. Kiss's methodology, as he explained, is based upon his professional experience in combination with his review of the published literature. (Doc. 151-27 at 62–64.) Defendants do not show how Dr. Kiss's methodology, which involves the compilation and application of published research with the assistance of his professional experience, is unreliable.

Defendants further contend that Plaintiffs' experts "assume[] exposure to contamination and then assume[] that because Robert Allen thereafter exhibited certain symptoms, those symptoms were caused by contamination." (Doc. 151 at 19.) Defendants do not, however, show how this process is any different from an appropriate form of differential diagnosis. In doing that analysis, a physician relies on professionally-informed speculation to rule in, and out, potential sources of the patient's condition. Plaintiffs' experts engaged in this form of analysis and found contaminated heparin to be the most likely cause of Dr. Allen's symptoms. Therefore, their opinions are reliable.

### ii. Testimony Conflicts with Medical Records and Treating Physician Opinion

Defendants next argue that Drs. Malgalski, Gorton, and Kiss's opinions are unreliable because they conflict with overwhelming evidence in the medical record that Dr. Allen was having a heart attack before the administration of heparin. (Doc. 151 at 212–23.) Plaintiffs respond by arguing that there is no conflict between their experts' testimony and the medical records, and alternatively, if there were such a conflict, reasonable minds can differ in interpreting medical records, making this an issue for cross-examination rather than exclusion. (Doc. 155 at 30–31.) Additionally, the Court agrees with Plaintiffs that Dr. Kiss's opinion is not assailable on these grounds, because

he did not render an opinion on whether Dr. Allen's heart attack began before or after the administration of heparin. (Doc. 155 at 31 n.1.) Defendants cite to seven instances in the record that they allege establish that Dr. Allen was having a heart attack prior to the administration of heparin.

First, a radiology note signed by a radiologist on December 1, 2007 at 9:51 p.m. stated "indications: myocardial infraction." (Doc. 151-18.) Dr. Magalski explained that the indication on that report is not the radiologist's conclusion following the X-ray, but the indication noted by the doctor ordering the X-ray. (Doc. 151-35 at 132.) The CPOE Electronic, Verbal and Phone Orders record shows that the requesting doctor ordered this X-ray with the indication "Myocardial Infarction," followed by the comment "r/o." (Doc. 151-20 at 7.) As Dr. Magalski explained in his deposition, r/o means "rule out," which establishes that the doctor was ordering the X-ray to rule out myocardial infarction rather than stating that Dr. Allen certainly suffered from a myocardial infarction. (Doc. 151-35 at 136.) Thus, the record noting "indications: myocardial infarction" does not establish that Dr. Allen was having a heart attack either at the time the X-ray was ordered or when it was administered.

Second, records from December 1, 2007 at 11:54 p.m. indicated that a cardiology consult was ordered based upon a "markedly abnormal" electrocardiogram and which recommended an electrocardiogram the following morning "to rule out protocol." (Doc. 151-19 at 3.) Dr. Magalski's rebuttal report noted that the electrocardiogram "is quite consistent with Dr. Allen's history of . . . [prior congenital heart disease] and subsequent closure with residual right ventricular enlargement. As pointed out by several attending physicians, one would need an old E[K]G to compare to say that there is an acute change." (Doc. 151-25 at 4.) Thus, these records do not definitively show that Dr. Allen was having a heart attack at this time.

Third, an electrocardiogram order at 10:09 a.m. on December 2, 2007, read "Indication: AMI [acute myocardial infarction]." (Doc. 151-20 at 20.) Unlike the electrocardiogram order discussed above, this order—which is a part of the same

document—does not include "r/o" or "rule out." Neither Plaintiffs nor their experts address this electrocardiogram order. These experts' unexplained conflict with record evidence weakens the reliability of their opinions.

Fourth, a "Clinical Notes Report" noted that "[d]uring the course of his Emergency Department Evaluation" Dr. Allen "was found to be having an anterior myocardial infarction." (Doc. 151-21 at 2.) As Dr. Magalski explained, the doctor who dictated this report did so on June 10, 2008, six months after the events occurred, with awareness that Dr. Allen did ultimately have a myocardial infarction. (Doc. 151-35 at 130.) Thus, there are concerns as to the veracity of the timeline of this non-contemporaneous record.

Fifth, Dr. Allen's discharge summary stated that "[p]atient is a 45-year-old gentleman who was admitted to Mayo Clinic Hospital on 12/01/07 with myocardial infarction." (Doc. 151-22 at 2.) As Plaintiffs note, however, Dr. Allen's admission record indicates that Dr. Allen was admitted with "Abdominal Pain," without mention of a myocardial infarction. (Doc. 155-8 at 2.) These records establish a conflict as to Dr. Allen's admission condition.

Sixth, Dr. Fortuin, Dr. Allen's treating physician, repeatedly testified about the concern that Dr. Allen was having a heart attack before exposure to heparin. (Doc. 151-23 at 28.) But Dr. Fortuin became Dr. Allen's treating physician in the catheterization lab after Dr. Allen was first given heparin. Thus, Dr. Fortuin did not have an opportunity to make an independent assessment of Dr. Allen's condition prior to heparin exposure. Therefore, whatever additional authority is due to a treating physician's opinion does not apply to Dr. Fortuin's comments regarding Dr. Allen's condition before he was under Dr. Fortuin's care.

Seventh, Nurse Christine Smith, who administered the bolus doses of heparin, testified "I recall the telemetry monitor change and then the verbal order for the Heparin administration." (Doc. 151-24 at 65.) Dr. Magalski addressed this in his deposition, noting that "a lot of times the monitors will sound or there will be subtle changes.

Patients may move. It's not an electrocardiogram . . . Monitor changes occur not infrequently." (Doc. 151-35 at 152.) Therefore, as Dr. Magalski notes, Nurse Smith's recollection that there was a telemetry monitor change prior to the call to administer heparin does not necessarily indicate that Dr. Allen was having a heart attack at that time.

Dr. Magalski adequately addresses six of the seven records that Defendants contend are in direct conflict with his and Dr. Gorton's testimony. While the unexplained contrary record certainly weakens these experts' reliability, it only does so minimally, given these experts' independent review and analysis of Dr. Allen's medical presentation. Treating doctors, and the records they produce, are entitled to some heightened authority due to their firsthand accounts of the patient's condition, but they are not sacrosanct. As Dr. Magalski notes, when people create and compile records "it isn't always consistent or accurate." (*Id.* at 130.)

None of the cases that Defendants cite hold that exclusion of expert testimony is appropriate where a qualified expert performed an analysis, based on the patient's medical presentation, which minimally conflicts with record evidence. *See Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 8 (1st Cir. 2010) (excluding expert testimony that fetal heart rate was low that conflicted with the expert's own reading of record evidence combined with the experts' own definition of low heart rate); *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (excluding expert testimony on the standard of care where the expert's opinion was unsupported "by any data," was later contradicted by the expert, and was inconsistent with factual evidence due to incomplete review of the record); *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn. P.C.*, 388 F.3d 976, 983 (6th Cir. 2004) (excluding non-local doctor's expert testimony on the local standard of care that conflicted with local doctors' opinions); *Buxton v. Lil' Drug Store Prods., Inc.*, No. 2:02CV178KS-MTP, 2007 WL 2254492, at *12 (S.D. Miss. Aug. 1, 2007) (excluding expert testimony that the plaintiff's injury was due to a stroke, rather than a pulmonary embolism causing cardiac arrest, where the expert was neither a cardiologist nor a neurologist, the expert's testimony conflicted with that of the treating physicians, and the

expert failed to "identify those portions of the medical record that purportedly support his theory.").

Finally, Dr. Kiss's opinion that there would be no reason to give heparin to a patient except to address "a cardiac event," which seems to conflict with Drs. Magalski and Gorton's opinions, is a matter for cross-examination. Dr. Kiss did not produce the records at issue in this case and was not Dr. Allen's treating physician. Thus, his opinion is no more authoritative than Plaintiffs' other experts.

### iii.  Failure to Consider Scientific Evidence

Defendants next contend that Plaintiffs' experts' opinions are unreliable in failing to consider contrary scientific evidence in two ways. First, Plaintiffs' experts opine that contaminated heparin "can cause myocardial infarction, cardiogenic shock, and death," and Defendants contend that these opinions are not supported in the medical literature and are in conflict with "extensive investigation conducted by public health authorities." (Doc. 151 at 22.) As discussed above, these experts can reliably testify that contaminated heparin can cause these symptoms.

Second, Defendants contend that Dr. Kiss's opinion that the redness of the clot in Dr. Allen's heart indicated the presence of contaminated heparin is in conflict with published medical literature on the topic. (*Id.*) Dr. Kiss's opinion begins by examining a report by one of Dr. Allen's treating physicians, Dr. Fortuin. (Doc. 151-27 at 18.) Dr. Fortuin noted that "on gross inspection the thrombus is red, consistent with a venous source. Given his history of AS[D] repair, this obviously is the leading suspect for further evaluation." (Doc. 155-17 at 3–4.) Dr. Kiss further found important Dr. Fortuin's deposition testimony regarding the significance of the appearance of the thrombus, (Doc. 151-27 at 29), where Dr. Fortuin testified:

> [I]t looked like there was a thrombus, so it looked like there was more of an embolism picture than this standard garden variety infarction, which is in situ thrombosis of the artery . . . . So in those cases, I think it's important and I always try to emphasize in the plan that we should be looking for other etiologies of the heart attack other than the Garden Variety Type I infarctions.

(Doc. 151-23 66.)

Dr. Kiss then examined the records from when Dr. Allen's heart was removed, which mention that the ASD repair was still intact, which indicated to Dr. Kiss that the source of the red clot was not venous, but was from some other peculiar source, which according to him was contaminated heparin. (Doc. 151-27 at 179–80.)

At Dr. Kiss's deposition, Defense counsel asked him to review a study indicating that red clots were common in patients who had heart attacks similar to Dr. Allen. (*Id.* at 174–75.) Dr. Kiss disagreed with the study, primarily on the grounds of his own experience in combination with the fact that Dr. Fortuin's examination of the clot was macroscopic in contrast to the microscopic identification in the study. (*Id.* at 179, 198.) On balance, Dr. Kiss's explanation is sufficiently reasonable to weather the admissibility determination, and can be challenged by scientific studies on cross-examination.

### iv. Improper Narrative Opinion

The Defense challenges Drs. Magalski and Gorton's opinions regarding the timing of the first bolus dose of heparin as improper narrative testimony. (Doc. 151 at 24–25.) In particular, Defendants note that these opinions contain the "same word-for-word narrative regarding the supposed timing of the first heparin bolus," which is "particularly egregious where, as here, Drs. Magalski and Gorton have no expertise in [the] charting practices" at Mayo. (*Id.*) Furthermore, Defendants note that Dr. Kiss, another of Plaintiffs' experts, testified that "it may be impossible now to figure out with certainty the exact time that the heparin was administered," which conflicts with Drs. Magalski and Gorton's testimony on the certainty of the timing. (Doc. 151 at 25.)

The Court agrees that both experts provide nearly the exact same testimony regarding the timing of the first heparin bolus. *Compare* (Doc. 151-14 at 6–9), *with* (Doc. 151-15 at 6–9.) In this testimony, the experts rely on record evidence, and their knowledge of charting practices, to opine that heparin that was pulled in the morning, which was to be given to Dr. Allen at 2:00 p.m., was instead given as the first bolus dose at 10:15 a.m. *See* (Doc. 151-14 at 6–9; Doc. 151-15 at 6–9.)

Drs. Magalski and Gorton's opinions regarding the timing of the first bolus dose are admissible, because the doctors utilize their expertise in compiling and contextualizing the record. Generally, an expert may not provide narrative testimony pulled directly from the record without "some analysis, opinion, or expertise." *Johnson v. Wyeth LLC*, No. CV 10-02690-PHX-FJM, 2012 WL 1204081, at *3 (D. Ariz. Apr. 11, 2012); *see In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009). Here, however, Drs. Magalski and Gorton utilize their expertise in charting practices to interpret and explain the record, which will ultimately assist the jury in understanding these experts' opinions regarding the timing of the first bolus dose. *See In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2:12-cv-4301, 2014 WL 186872, at *16 (S.D.W.V. Jan. 15, 2014) (admitting statements regarding record testimony that "provide the factual basis" for the expert's opinion because they are "helpful for the jury to understand" the expert's opinion). Therefore, these experts' opinions on the timing of the first bolus dose do not constitute improper narratives.

Defendants further suggest that these experts' opinions on charting practices are unreliable because they do not have knowledge of Mayo's charting practices. (Doc. 151 at 25.) Dr. Gorton testified, however, that Mayo is accredited by the Joint Commission, which issues standards on charting, that he is "very intimately familiar" with those standards, and that he is an "expert in medical charting in general." (Doc. 151-36 at 199–201.) Dr. Magalski also addressed this concern by testifying that he could testify as to charting practices given his years of experience. (Doc. 151-35 at 150.) Given these experts' extensive experience with charting in general, gained while working in multiple hospitals, their testimony regarding charting practices is reliable. Evidence that Mayo does not follow general medical charting practices is a more appropriate means for challenging their testimony on cross-examination.

Finally, as noted above, conflict among Plaintiffs' experts is an appropriate matter for cross-examination, rather than exclusion.

**d. Qualifications to Render Particular Opinions**

Defendants contend that Drs. Kiss, Jeske, and Gorton lack the necessary qualifications to render certain expert opinions. (Doc. 151 at 25–26.) Experts may be qualified by "knowledge, skill, experience, training, or education" to offer their opinions. Fed. R. Evid. 702.

First, Defendants challenge Dr. Kiss's qualifications to offer specific causation opinions because he is not an expert in "cardiovascular disease, cardiomyopathy, cardiomegaly, cardiac stenosis, myocardial infarction, EKG changes, changes in troponin, and cardiac catheterization." (Doc. 151 at 25.) Plaintiffs respond that Dr. Kiss is "an expert in, among other things, increased clotting and HIT," that his testimony was that OSCS caused unusual clotting leading to Dr. Allen's symptoms, and that Dr. Kiss "deferred to cardiology experts on issues relating to the heart." (Doc. 155 at 33.) Defendants reply that "Dr. Kiss seeks to opine on cardiac issues," (Doc. 160 at 14), including his testimony that he could summarize his beliefs that "make it highly consistent or highly suggestive that something external to the typical cardiac case could cause clots like this," (Doc. 151-27 at 51.) Dr. Kiss is qualified to provide testimony on specific causation. His references to areas ostensibly outside of his expertise, such as the heart, are made in the context of his opinions on clotting, which is within his expertise. *See* (*id.*)

Second, Defendants challenge Dr. Jeske's specific causation opinion that Dr. Allen "suffered from hypercoagulability and HIT" based upon Dr. Jeske's "purported review of 'the medical care, treatment and conditions'" of Dr. Allen. (Doc. 151 at 26 (quoting Doc. 151-17 at 1.)) Defendants argue that Dr. Jeske has a Ph.D. in pharmacology, rather than an M.D., and is therefore unqualified to testify as to medical issues. (*Id.*) In support of this argument, Defendants cite *In re Mirena IUD Products Liability Litigation*, where the court found a biomedical engineer unqualified to testify on the effects of a hormone contained in a contraceptive device, given that he neither was "a medical doctor" nor did he "have relevant experience or expertise in hormonal

contraception or the effects of hormones on uterine tissues."  169 F. Supp. 3d 396, 439 (S.D.N.Y. 2016).  Unlike the expert in *Mirena*, Dr. Jeske has extensive experience and expertise in engaging in primary research on the effects of the relevant mechanism at issue, which here is contaminated heparin.  Therefore, while he is not a medical doctor, he does have "relevant experience" and "expertise" that qualify him to testify as to the effects of contaminated heparin both generally and specifically.

Third, Defendants challenge Dr. Gorton's conclusion that Dr. Allen received contaminated heparin with the first bolus dose, arguing that Dr. Gorton did not perform a product identification analysis.  (Doc. 151 at 26.)  Dr. Gorton clearly engaged in a medical, rather than product identification, analysis to conclude that Dr. Allen received contaminated heparin.  *See* (Doc. 151-36 at 181 ("[B]ased on the evidence that I've seen, including and emphatically the reactions that were seen clinically that I can't explain otherwise, I do believe that he received contaminated heparin with that bolus."))  Therefore, he can properly render such an expert opinion.

### e.  Conclusion

Considering all of Defendants' challenges, Plaintiffs' causation experts are sufficiently qualified, and their testimony is sufficiently reliable, to serve as expert witnesses at trial.

### C.  Plaintiffs' Professional Standard of Care Experts

Plaintiffs have retained two expert witnesses who will testify on standard of care issues: Dr. Suzanne Parisian and Dr. Clifford Siporin.  *See* (Doc. 153 at 1–2.)  The MDL court has already performed extensive *Daubert* analyses on these experts and has determined that they may testify subject to certain limitations.  (Doc. 150-1.)  Both parties agree that the MDL court's limitations apply.  *See* (Doc. 150; Doc. 153 at 2.)  Defendants, concerned that these experts' revised reports establish an intention to testify beyond the MDL court's limitations, now request that this Court clarify that the MDL court's rulings apply as to these experts.  (Doc. 150.)  Furthering Defendants' concern is aspirational language in Plaintiffs' response, indicating that they will "attempt to abide"

and "will try to abide" by the MDL court's limitations. (Doc. 157 at 2 (quoting Doc. 153 at 2) (emphasis removed.))

To resolve this undisputed issue, this Court reiterates that the MDL's courts limitations are binding.

### IV. Summary Judgment

#### A. Legal Standard

Summary judgment is appropriate where there is no genuine dispute of material fact and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by 'citing to particular parts of materials in the record,' . . . or by 'showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'" *Ericson v. City of Phoenix*, No. CV-14-01942-PHX-JAT, 2016 WL 6522805, at *6 (D. Ariz. Nov. 3, 2016) (quoting Fed. R. Civ. P. 56(c)).

The initial burden is on the movant to show that the non-movant cannot establish a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant makes this showing, the burden then shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," but rather must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)).

A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court may grant summary judgment where the evidence is "merely colorable or is not significantly probative." *Ericson*, 2016 WL 6522805, at *7. "All justifiable inferences are to be drawn in" favor of the non-movant.

*Anderson*, 477 U.S. at 255.

Finally, the parties' motions must "include citations to the specific paragraph in" a separately filed statement of facts "that supports assertions made . . . regarding any material fact on which the party relies in support of or in opposition to the motion." LRCiv 56.1. Voluminous citations to the statement of facts do not establish a genuine dispute of material fact. *Varela v. Perez*, No. CV-08-2356-PHX-FJM, 2011 WL 1118991, at *1–2 (D. Ariz. Mar. 28, 2011) (finding no genuine issue of material fact where plaintiffs, among other things, made "global citations to more than 200 statements of fact"); *see* LRCiv 56.1.

### B. Direct and Indirect Corporate Liability

ACAS moves for summary judgment on all of Plaintiffs' claims, arguing that Plaintiffs have not shown that ACAS is directly liable for its allegedly tortious conduct—because it did not manufacture, distribute, or sell contaminated heparin—or that it is indirectly liable as a shareholder of SPL. (Doc. 164 at 9.)

### 1. Direct Corporate Liability

Plaintiffs make three direct liability claims against ACAS: participation, assumption of duty, and in concert action. (Doc. 183 at 2.)

#### a. Participation

First, Plaintiffs contend that ACAS "directed the manufacture, marketing, and sale of heparin," and as such is directly liable. (*Id.* at 6.)

A parent company can be liable for a subsidiary's acts where the parent directly participates and directs the subsidiary's harmful activities. *See, e.g.*, *U-Haul Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. CV-10-1047-PHX-SMM, 2011 WL 9111, at *3 (D. Ariz. Jan. 3, 2011) (citing *Gatecliff v. Great Republic Life Ins. Co.*, 821 P.2d 725, 728 (Ariz. 1991)); *Anglo E. Bulkships Ltd. v. Ameron, Inc.*, 556 F. Supp. 1198, 1202–03 (S.D.N.Y. 1982). Plaintiffs find instructive *Anglo Eastern*, where the court held a parent company liable for its own acts and omissions involved in the sale of its subsidiary's chemical tank coatings. 556 F. Supp. 1198 at 1202–03. In that case, the

parent was involved "sometimes intimately, sometimes tangentially, with many of the activities" that resulted in the lawsuit. *Id.* Specifically, the parent developed the formula for the coatings and provided them to the subsidiary pursuant to a licensing agreement, the packaging for the coatings bore the parent's trademark, the parent and the subsidiary "were in constant contact regarding" the coatings, the parent was directly involved in the creation and publication of the lists denoting which types of chemicals could be used with the coatings—the alleged deficiencies in which were central issues in the case—the parent's approval was required for all of the subsidiary's "major financial undertakings, managerial changes, and corporate policy decisions on all claims arising out of the use of" the coatings, and the parent's sales team convinced the plaintiffs to use the coatings on their chemical tanks. *Id.*

While the record does not show that ACAS was nearly as involved as the parent in *Anglo Eastern*, Plaintiffs have produced sufficient evidence to withstand summary judgment on the participation theory of direct liability. A 2007 email from an SPL board member to ACAS employees indicates that ACAS had a direct and dispositive role in deciding whether SPL Acquisition Corp. would acquire Mobren, a supplier of the porcine materials necessary to create heparin API, which SPL and ACAS hoped to use to "accomplish quick[] and efficient[] . . . stability in the US [heparin] market." (Doc. 184-6 at 11–12; Doc. 184-3 at 43.) A reasonable jury could find that this email establishes ACAS's direct role in the manufacture and sale of heparin. Therefore, ACAS is not entitled to summary judgment on a direct participation theory of liability.

### b. Assumption of Duty

Plaintiffs further argue that ACAS is directly liable under an assumption of duty theory. (Doc. 183 at 8.) Plaintiffs spend six pages describing their legal theory, but make only one glancing reference to ACAS, without citation to the record. *See* (*id.* at 8–14.) Because there is no genuine issue of material fact, and because ACAS is entitled to judgment as a matter of law, Plaintiffs cannot bring a direct liability claim against ACAS under an assumption of duty theory.

### c. In Concert

Plaintiffs argue that ACAS is directly liable because it "acted in concert with SPL and gave substantial assistance to SPL with full knowledge that SPL's acts and its own constituted negligence." (Doc. 183 at 14.)

Under the Restatement (Second) of Torts, one is subject to in concert liability for harming a third party under three separate theories. Restatement (Second) of Torts § 876 (Am. Law. Inst. 1979). Arizona has explicitly adopted the first two theories, but not the third. *See Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 23, 36 (Ariz. 2002).

The first theory is civil conspiracy. Under this theory, a defendant is liable for performing "a tortious act in concert with" another or "pursuant to a common design with him" that results in harm to a third party. § 876(a); *Wells Fargo*, 38 P.3d at 36. Essentially, this requires "that two or more individuals agree and thereupon accomplish 'an underlying tort which the alleged conspirators agreed to commit.'" *Wells Fargo*, 38 P.3d at 36. The presence of a conspiracy may be "inferred from the nature of the acts, the relationships of the parties, 'the interests of the conspirators, or other circumstances.'" *Mohave Elec. Coop., Inc. v. Byers*, 942 P.2d 451, 465 (Ariz. Ct. App. 1997).

The second theory is aiding and abetting the commission of a tort. Under this theory, a defendant is liable where a primary tortfeasor causes harm to the plaintiff, the defendant knows that the primary tortfeasor's conduct "constitutes a breach of duty," and the defendant "substantially assist[s] or encourage[s] the primary tortfeasor in the achievement of the breach." *Wells Fargo*, 38 P.3d at 23; § 876(b). The defendant's knowledge of the underlying tort "may be inferred from the circumstances." *Wells Fargo*, 38 P.3d at 23. Substantial assistance need not have been necessary to commit the tort, but "means more than 'a little aid.'" *Id.* at 26–27 (quoting *In re Am. Cont'l Corp./Lincoln Sav. and Loan Sec. Litig.*, 794 F. Supp. 1424, 1435 (D. Ariz. 1992)).

Although not yet adopted, two facts make it likely that the Arizona Supreme Court would adopt the third theory, making it applicable to this case. *See Lewis v. Tel. Emps.*

*Credit Union*, 87 F.3d 1537, 1545 (9th Cir. 1996) (noting that absent a state high court decision, federal courts look to intermediate appellate court decisions and restatements, among other things, to determine the applicability of state substantive law). First, two unpublished state appellate court decisions utilize the third circumstance in analyzing tort liability. *See Yager v. Pastor*, No. 2 CA-CV 2016-0085, 2016 WL 6819666, at *4 (Ariz. Ct. App. Nov. 18, 2016); *Best v. Mosely*, No. 1 CA-CV 10-0700, 2011 WL 4857770, at *4–5 (Ariz. Ct. App. Oct. 13, 2011). Second, the Arizona Supreme Court adopted the other two circumstances contained in the same Restatement section with little analysis, suggesting its willingness to utilize the Restatement's in concert provisions. *See Wells Fargo*, 38 P.3d at 475, 498. Under the third theory, a defendant acts in concert with another when he "gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." § 876(c).

The record, reasonably interpreted in a manner most favorable to Plaintiffs, sets forth facts that a reasonable jury could interpret to find ACAS liable under any of the three tests for in concert liability. The record, taken as a whole, could be understood to show that ACAS was aware of safety issues in SPL's facilities—establishing SPL's negligence—that ACAS was directly negligent by assisting SPL in the manufacture and sale of heparin, and that ACAS impliedly agreed to, and did, provide substantial assistance to SPL in engaging in such negligence. *See* (Doc. 184 at 14–32.) Thus, there are genuine issues of material fact as to ACAS's in concert liability, and as such ACAS's request for summary judgment on this issue is denied.

### 2. Indirect Corporate Liability

Generally, shareholders of a corporation are not liable for the corporation's torts. *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998). The corporate veil that limits shareholder liability, however, may be pierced in a limited set of circumstances. *Id.* at 62. In determining whether a plaintiff may pierce the corporate veil, the law of the state of incorporation applies. *Gemstar Ltd. v. Ernst & Young*, 917 P.2d 222, 230 (Ariz.

1996).   The relevant entities, SPL and SPL Acquisition Corp., were formed and incorporated in Delaware, respectively.  (Doc. 164 at 4–5.)  Therefore, Delaware law governs the veil piercing analysis.  The same standards for veil piercing apply to the corporate and LLC contexts.  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176–78 (2d Cir. 2008); *see Yu v. GSM Nation, LLC*, No. 12293-VCMR, 2017 WL 2889515, at *3–4 (Del. Ch. July 7, 2017).

To pierce the corporate veil, "the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud." *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) (citing *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999)).  Making this showing is "a difficult task."  *Mason v. Network of Wilmington, Inc.*, No. Civ.A. 19434-NC, 2005 WL 1653954, at *2 (Del. Ch. July 1, 2005).  Factors that bear on the analysis include: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a façade for the dominant shareholder."  *Doberstein v. G-P Indus., Inc.*, No. 9995-VCP, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015) (quoting *Microstrategy Inc. v. Acacia Research Corp.*, No. 5735-VCP, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010)).

Defendants note that ACAS did not form SPL, that ACAS was an indirect investor in SPL, that ACAS and SPL maintained separate boards of directors, that ACAS did not manage the day-to-day operations of SPL, that SPL's finances were completely separate from ACAS's, and that SPL was adequately capitalized, both at the time it was formed and in 2007, and as such, Plaintiffs cannot pierce SPL's corporate veil.  (Doc. 164 at 5–8.)

The first veil that must be pierced is that of SPL, a Delaware LLC.  Plaintiffs incorrectly cite Arizona law to argue that the corporate veil should be pierced.  (Doc. 183 at 16–18.)  In Arizona, shareholder limited liability will be disregarded where a plaintiff

shows: "(1) unity of control and (2) that the observance of the corporate form would sanction a fraud or promote injustice." *Gatecliff v. Great Republic Life Ins. Co.*, 821 P.2d 725, 728 (Ariz. 1991). Unity of control can be shown through "stock ownership by the parent; common officers or directors; financing of subsidiary by the parent; payment of salaries and other expenses of subsidiary by the parent; failure of subsidiary to maintain formalities of separate corporate existence; similarity of logo; and plaintiff's lack of knowledge of subsidiary's separate corporate existence." *Id.* While these factors ultimately bear on the disregard for corporate formalities and whether the subsidiary is a mere façade, Plaintiffs entirely fail to address adequate capitalization, solvency, and siphoning of funds. Therefore, Plaintiffs will have to make a strong showing on the two factors it does address.

Plaintiffs contend that ACAS owned 87% of SPL's common stock and obtained control through "its ability to convert its convertible preferred stock into common stock, of which it owned 97.3%" (Doc. 183 at 17.) Furthermore, Plaintiffs argue that three of SPL's directors were ACAS officers. (*Id.* at 17; Doc. 184 23–24.) Even together, majority ownership combined with overlapping officers and directors is insufficient to pierce the corporate veil. *Scott-Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 314 (Del. Super. Ct. 1973).

Plaintiffs further contend that ACAS financed SPL by entering into a Blocked Account Control Agreement whereby ACAS obtained a security interest, and control over, SPL's deposit accounts. (Doc. 184 at 24; Doc. 183 at 17.) SPL entered this agreement, however, with American Capital Financial Services, Inc. ("ACFS"), which was a subsidiary of ACAS, rather than ACAS itself. (Doc. 184-2 at 3.) Additionally, this control was given in exchange for ACFS providing a loan to SPL and for assisting in managing SPL's finances. (*Id.*) Contrary to Plaintiffs' characterization, this contract represents a negotiation at arms-length between third parties rather than a parent's domination of a subsidiary.

Additionally, Plaintiffs contend that an ACAS executive was the sole member of

SPL's Salary and Bonus Committee who approved salary actions taken by SPL for "key SPL executives." (Doc. 183 at 18.) Plaintiffs cited facts fail to support these allegations (Doc. 184 at 26.) Therefore, this argument does not lend support for piercing the corporate veil.

Plaintiffs further argue that there was a failure to maintain corporate formalities because SPL's officers and directors took orders from ACAS and acted in ACAS's interest in two instances. (Doc. 183 at 18.) First, ACAS officers and directors, with SPL officers and directors, decided not to not show a report to the FDA and to have an auditor mark the report as a draft so it would not be on file. (Doc. 184 at 22.) Plaintiffs do not cite facts showing that ACAS ordered, rather than made a joint decision with, SPL to engage in these activities. Second, Plaintiffs argue that ACAS advised SPL regarding the content of its website, removed an SPL press release that ACAS acquired SPL, reviewed and edited SPL press releases prior to issuance, hired a public relations firm and a spokesman to represent SPL, and identified the spokesman as SPL's rather than ACAS's. (Doc. 184 at 25–26.) Initially, ACAS removed its own press release regarding its acquisition of SPL from its own website, which does not indicate it was controlling SPL's public statements. (Doc. 184-5 at 11.) Furthermore, Plaintiffs' citation to the record does not support their proposition that "American Capital told SPL what representations it could make concerning the SPL corporate timeline." (Doc. 184 at 26; Doc. 184-5 at 28.) In fact, the record indicates that while SPL took ACAS's comments into account, they did not always utilize them. *See* (Doc. 184-6 at 24 (SPL criticizing and rejecting a proposed edit by ACAS.)) Thus, Plaintiffs fail to establish ACAS and SPL's disregard of corporate formalities.

Plaintiffs do not argue that ACAS and SPL had similar logos, but rather note in the context of this factor that ACAS controlled SPL's communications with the public and third parties. (Doc. 183 at 18.) Plaintiffs do not explain how this bears on the piercing analysis.

Furthermore, to show Plaintiffs' lack of knowledge of the subsidiary's separate

corporate existence, Plaintiffs argue that ACAS employees had contact with all of SPL's customers, set the price for heparin, and negotiated the agreement under which SPL supplied heparin to Baxter. (Doc. 183 at 18.) Plaintiffs' cited facts, however, fail to show that Plaintiffs—or any other third parties—were unaware of the separate corporate existence of ACAS and SPL. (Doc. 184 at 29–31.) Additionally, Plaintiffs' cited facts fail to support their claim that ACAS negotiated SPL's supply agreement with Baxter. (Doc. 184 at 29–31.)

Finally, Plaintiffs allege, without citation, that "ACAS involved itself in SPL's acquisition and testing of contaminated raw materials. It knew the supply was not safe and sought to cover up that knowledge. It controlled all significant aspects of SPL's operations." (Doc. 183 at 18.) To the extent Plaintiffs were attempting to show the requisite use of the corporate entity to engage in fraud, they fail to ground their allegations in the record.

Overall, giving all reasonable inferences to Plaintiffs, the Court finds that Plaintiffs have not established that ACAS was using SPL's corporate form to further a fraud, or that SPL was an alter-ego of ACAS. To the contrary, Plaintiffs own citations show that the two companies respected the corporate form. Therefore, SPL's corporate veil cannot be pierced and ACAS cannot be held liable as a shareholder for SPL's actions. Because the primary veil cannot be pierced, the secondary veil of SPL Acquisition Corp. will not be considered. Therefore, because there is no genuine dispute of material fact as to indirect corporate liability and because ACAS is entitled to judgment as a matter of law, ACAS is granted summary judgment on this issue.

### C. Punitive Damages

In Arizona, punitive damages are only available where the plaintiff shows upon clear and convincing evidence that the "defendant's evil hand was guided by an evil mind." *Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz. 1986); *Linthicum v. Nationwide Life Ins. Co.*, 723 P.2d 675, 681 (Ariz. 1986). Clear and convincing evidence requires the proponent to show that "the thing to be proved is highly probable or reasonably certain."

*Kent K. v. Bobby M.*, 110 P.3d 1013, 1018–19 (Ariz. 2005) (quoting Black's Law Dictionary 1201 (7th ed. 1999)).  An evil mind is present where the defendant "(1) intended to cause injury; (2) engaged in wrongful conduct motivated by spite or ill will; or (3) acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others."  *Holy Trinity Greek Orthodox Church v. Church Mut. Ins. Co.*, 476 F. Supp. 2d 1135, 1140 (D. Ariz. 2007) (quoting *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 758 P.2d 1313, 1324 (1988)).  This evil mind "may be established by [a] defendant's express statements or inferred from [a] defendant's expressions, conduct, or objectives."  *Gurule v. Ill. Mut. Life and Cas. Co.*, 734 P.2d 85, 87 (Ariz. 1987).  Such wantonly tortious conduct invokes similar outrage to that usually found in response to a crime, *Rawlings*, 726 P.2d at 578, and surpasses "gross negligence or mere reckless disregard of the circumstances."  *Linthicum*, 723 P.2d at 680.

Defendants move for summary judgment on the grounds that they did not intentionally cause injury and they did not consciously disregard a substantial risk that their conduct might significantly injure the rights of others.  (Doc. 162 at 2–3.)[4]  To support their motion, Defendants cite facts showing that the FDA and Plaintiffs' experts believe that the contaminant was intentionally introduced by an unknown third-party to the crude heparin in a manner designed to pass standard United States Pharmacopeia ("USP") testing, that Baxter and SPL utilized USP testing, and that Baxter and SPL were not aware of the contamination until after Dr. Allen was given heparin.  (*Id.* at 7–10.)

Plaintiffs present no evidence that Defendants intentionally introduced the contaminants into the heparin API or the final heparin product; therefore, Plaintiffs cannot pursue this theory of punitive damages.  Therefore, Plaintiffs remaining punitive damages theory must show that Baxter and SPL were consciously aware of a risk of substantial injury to others and that they consciously disregarded that risk.

[4] Baxter and SPL, unlike ACAS, do not otherwise move for summary judgment on the strict liability, negligence, statutory wrongful death, and statutory survival claims, unless Plaintiffs' experts are excluded.  (Doc. 162.)

Plaintiffs cannot show that Baxter was aware of a significant risk nor that it disregarded such a risk. Plaintiffs themselves argue that "[i]t is self-evident that if Baxter's senior management responsible for quality were so deeply confused about SPL's operations *after* the heparin crisis when Baxter was trying to do damage control, Baxter had no better understanding of the critical product safety issues before the crisis." (Doc. 181 at 16 (emphasis in original.)) Plaintiffs thus implicitly concede that Baxter could not have consciously disregarded a substantial risk that its conduct might injure others, given that Baxter did not understand the risks involved. Therefore, Baxter could not have had the requisite evil mind to justify the imposition of punitive damages upon them.

Plaintiffs' attempts to show that SPL had knowledge of a significant risk fail. First, Plaintiffs cite to a 1996 SPL document discussing the Chinese heparin market. (Doc. 181 at 6.) Plaintiffs argue that because this document noted that there were quality issues in China, that SPL was aware of the dangers of Chinese heparin. (*Id.*) This document, however, does not describe what the quality issues were. (Doc. 182-4 at 93–94.) Therefore, it does not indicate that SPL was aware that there were dangerous quality issues posing safety concerns for future patients establishing a substantial risk.

Second, Plaintiffs cite to a 1998 audit of SPL's Wisconsin facility, claiming that the auditor "advised that SPL pay attention to 'additional (purity) characterization of crude Chinese heparin.'" (Doc. 181 at 8 (quoting Doc. 182-4 at 97.)) This document, however, reflects that SPL did not believe this to be a substantial risk. Rather, it describes SPL's understanding that the auditor expressed "no major concerns," but that "SPL *might* want to pay attention to" issues with the purity of Chinese heparin. (Doc. 182-4 at 97 (emphasis added.)) Thus, even with the auditor's recommendation, the document shows that SPL did not understand this to be a critical issue.

Third, Plaintiffs cite a 1989 article established testing solutions for differentiating pure heparin from OSCS. (Doc. 181 at 8.) Plaintiffs, further cite a memorandum by an SPL employee recommending this form of testing to show that SPL was aware of the need for additional testing of heparin products. (Doc. 181 at 8.) Plaintiffs find

significant the employee's statement that "[b]esides compendial [USP] and customer driven specifications, it is essential for SPL to perform disaccharide and C NMR analyses on its unfractioned heparin. These analyses assist SPL to understand its heparin purification process scrupulously." (Doc. 182-4 at 104.) As relevant, however, the employee justified such testing on the grounds that it "*may* assist" SPL in refining their testing process and that it would have helped SPL in providing "more comprehensive information" to their customers about their "heparin quality." (*Id.* at 105 (emphasis added.)) Nothing in this document shows that the employee, or SPL as an organization, understood this testing to be necessary to prevent a significant risk of injury to others or that SPL consciously disregarded such a risk.

Fourth, Plaintiffs cite a document showing that SPL told the FDA that they used galactosamine testing, (Doc. 181 at 8), that SPL did not actually have such testing, (Doc. 182 at 32), and that such testing would have caught the OSCS contamination, (*id.*) Plaintiffs do not explain how SPL's statements to the FDA bear on their own awareness as to the substantial risk that OSCS contamination posed. In fact, the FDA told SPL that they were concerned with contamination from "viruses, pathogens, antibiotics, pesticides, and herbicide residuals," not OSCS. (Doc. 182-4 at 26.) Therefore, such statements to the FDA do not bear on SPL's awareness of a substantial risk of injury to others.

Fifth, Plaintiffs allege that SPL performed audits too infrequently and failed to appropriately address issues that arose in a 2002 audit. *See* (Doc. 181 at 9–10.) Initially, SPL wrote to the 2002 auditor noting that they had fixed the issues. (*Id.*) Plaintiffs do not proffer any facts showing that SPL did not fix such issues. More importantly, Plaintiffs fail to show how these auditing issues establish SPL's knowledge of a significant risk of injury to others or conscious disregard of such a risk.

Sixth, Plaintiffs contend that the FDA never approved SPL's Chinese facility due to a clerical error, but that SPL never followed-up despite being aware of the need for testing. (Doc. 181 at 10.) Plaintiffs' statement of facts fails to cite the record to support the proposition that a clerical error allowed the FDA to approve SPL's Chinese facility

without inspection. (Doc. 182 at 37.) The Court has, however, located an article in the record supporting Plaintiffs' proposition that the FDA failed to inspect SPL's Chinese facility. (Doc. 182-6 at 29.) The record also indicates, however, that that Baxter initiated contact with the FDA to prompt inspection of the facility for approval. (Doc. 182-5 at 196.) Furthermore, even if SPL and Baxter had failed to follow up with the FDA, that would merely show negligence rather than a conscious disregard of a substantial risk of injury to others, and thus would not support the award of punitive damages.

Seventh, Plaintiffs allege that no other U.S. drug companies would use SPL's heparin that was manufactured and sourced in China. (Doc. 181 at 10.) In particular, they cite to deficiencies noted in an inspection done by Sanofi-Aventis, who considered sourcing heparin from SPL's China facility. (Doc. 181 at 11.) This evidence does not justify imposing punitive damages for two reasons. First, it shows the inspectors' mental state, rather than SPL's. Second, the inspectors defined their concerns as those "leading to a *less immediate risk*, but requiring an urgent and scheduled corrective action," rather than those involving "serious non-conformities which present an *immediate and significant risk* for the quality of the product or the health of the patients." (Doc. 182-5 at 208 (emphasis added.)) Therefore, the inspectors themselves did not think there was a significant risk. Therefore, these facts fail to justify the imposition of punitive damages.

Eighth, Plaintiffs cite to an audit of SPL's Wisconsin facility performed by Siegfried Ltd., where the auditor found multiple issues regarding product purity and safety. (Doc. 181 at 11.) SPL responded to this audit, however, by noting that there seemed to be a misunderstanding between the auditor and SPL regarding the issues at the facility. (Doc. 182-6 at 16 (indicating that SPL believed that if they had been given "a chance to discuss, much [of the issues] would be addressed.")) Furthering this point, Plaintiffs cite an email from an executive at SPL recommending dermatan sulfate testing, which would have caught OSCS contamination. (Doc. 181 at 11.) This document, however, shows that the executive did not think the testing was urgent, thus indicating he did not believe there was a significant risk of harm. (Doc. 182-6 at 19 ("John is in

agreement that we need to have a 'valid/validatable' and subsequently 'validated' test method for this compound, but not necessarily have it validated now.")) Furthermore, the executive was discussing this testing requirement in reference to conversations with an executive at Momenta, a potential SPL customer, and SPL modified its testing regimen based upon customer requirements. (*Id.*) Therefore, this email does not indicate that SPL thought it needed dermatan sulfate testing for all of its heparin products.

Ninth, Plaintiffs cite to documents showing that Baxter was aware that a majority of slaughterhouses in China were unlicensed, that SPL's Chinese facility was unaware of where it was sourcing its intestines from, that SPL was aware it needed to trace its sourcing, and that SPL was not even aware if the intestines they were receiving were porcine. (Doc. 181 at 11–12.) Plaintiffs fail to explain, however, how these facts establish SPL's awareness of a significant risk of injury to others through OSCS contamination or a conscious disregard thereof. Rather, these documents show that SPL was aware that it should be using porcine intestines rather than bovine intestines, because of the risk of Mad Cow Disease, which does not bear on the issue of OSCS contamination. (Doc. 182-6 at 35.)

Tenth, Plaintiffs argue that reports show that Baxter's supplier quality system was severely compromised. (Doc. 181 at 12.) Taking Plaintiffs' characterization of the record as true, the record does not show that Baxter or SPL consciously disregarded a substantial risk. Rather, Plaintiffs write that Baxter and SPL utilized audits to recognize deficiencies, attempted to address those deficiencies internally, and ultimately did not succeed in those attempts. (Doc. 182 at 41–42.) The facts show that Defendants attempted to address a risk rather than consciously disregarding it, and as such these facts cannot form the basis for punitive damages.

Eleventh, Plaintiffs final justification for punitive damages is that there were "a series of signs warning of potential quality problems with SPL's Chinese heparin and SPL openly discussed the risk of greedy or desperate heparin workshops deliberately adulterating the product." (Doc. 181 at 12.) Plaintiffs cite several factual situations to

attempt to establish SPL's conscious disregard of a substantial risk of injury.

Initially, Plaintiffs cite multiple documents and a deposition establishing that SPL was concerned about quality issues from suppliers in China, particularly due to SPL's inability to renegotiate prices with their suppliers in the face of increasing demand. (Doc. 182 at 42–44.) The record demonstrates, however, that SPL was concerned about Chinese suppliers contaminating the porcine intestines that SPL's customers desired with sheep intestines. *See* (Doc. 182-4 at 75, 78–81; Doc. 182-7 at 39–44.) Thus, the record does not show that SPL was concerned with OSCS contamination, but rather that it was concerned with contamination by sheep intestines, which it did not regard as a safety concern, but a business concern.

Moreover, Plaintiffs cite to emails showing that SPL was aware that they were receiving less potent materials from their suppliers. (Doc. 182 at 45.) These emails show, however, that SPL was concerned with the economic impact of such deficiencies, and did not see this as a safety concern. (Doc. 182-7 at 45–55.) Thus, these emails do not support the imposition of punitive damages.

Additionally, Plaintiffs cite to a series of emails following an email from Momenta indicating that there was low anti-clotting activity in some samples of SPL heparin. (Doc. 182 at 182.) These emails, however, show that SPL was concerned with these deficiencies and was interested in addressing them. (Doc. 182-7 at 57 (noting that the Momenta employee believed that SPL was concerned with following up regarding low anti-clotting activity and describing an SPL employee's internal follow-up.))

Furthermore, Plaintiffs cite to a series of emails regarding SPL's chemical testing process following an email from a potential client indicating that SPL's product was contaminated. (Doc. 182 at 45–46.) These emails, however, were sent in 2008, and do not indicate that SPL had knowledge of the potential for OSCS contamination prior to the production of the drugs that allegedly caused Dr. Allen's injury. (Doc. 182-7 at 62–67.) Plaintiffs argue that these emails show that SPL was aware of different purification and testing procedures for their U.S.-produced versus Chinese-produced products. (Doc. 182

at 46.)  The record does not show, however, that SPL was aware, prior to 2008, that these differences in purification and testing presented a substantial risk of injury to others. Thus, these emails do not bear on the punitive damage analysis.

Finally, Plaintiffs cite to documents and emails showing that two lots of heparin failed to meet a manufacturer's specifications, that the manufacturer rejected the lots, that SPL ultimately resold these lots to other manufacturers, and that these lots were later found to be contaminated with OSCS.  (Doc. 182 at 47.)  Plaintiffs further note that there is no indication that SPL ever engaged in a root cause analysis of these deficiencies.  (*Id.*) The record does not show, however, that SPL believed that these two lots posed a substantial risk of injury, but rather that the lots met the requirements of some manufacturers and not others.  (Doc. 182-4 at 133–74; Doc. 182-7 at 105–129; Doc. 182-8 at 1–73.)  Therefore, these documents do not support Plaintiffs' claim for punitive damages.

Giving Plaintiffs all reasonable inferences that can be drawn from the record, a reasonable jury could not find that Defendants acted with an evil hand guided by an evil mind, given the heightened clear and convincing evidence standard.  Therefore, Defendants are granted summary judgment on the issue of punitive damages.

### D.  Warranty Claims

Plaintiffs disavow any intention "to submit their breach of warranty claims at trial" because "the applicable law is clear" following remand from the MDL court.  (Doc. 181 at 18 n.1.)  Therefore Defendants are granted summary judgment on Plaintiffs' breach of warranty claims, contained in Counts III and IV of their Complaint.

### E.  Effect of Expert Exclusion

All Defendants finally move for summary judgment on all of Plaintiffs' claims if this Court excludes either Plaintiffs' product identification expert or causation experts. (Doc. 189 at 7–8.)

The case is appropriate for submission to the jury even without much of Plaintiffs' product identification expert's testimony.  As discussed above, this Court's ruling does

not preclude Mr. Moore from testifying, subject to future evidentiary objections, as to the Baxter lot numbers that were shipped to Cardinal, the NDC numbers on the heparin that Cardinal and Mayo purchased, and on the specifics of the Pyxis records.    A reasonable jury could find from the fact that after August 6, 2007 Mayo only purchased the 1000U/ML in 10ML vials from Baxter, and from the fact that the Pyxis records indicate an NDC number consistent with Baxter heparin in this dose size, that Dr. Allen received Baxter heparin for that dose size. (Doc. 149-1 at 7–8.) Similarly, a reasonable jury could find from the fact that after March 27, 2007, Mayo only purchased the 5000U/ML in 1ML vials from Baxter, that Dr. Allen received Baxter heparin in this dose size. (Doc. 149-1 at 23.)

From there, a reasonable jury could find from the Baxter lot numbers that Cardinal held, the NDC numbers of the heparin that Mayo held, the NDC number listed in the MetAltID field for the 1000U/ML in 10ML vials, and the medical testimony by Plaintiffs' causation experts, that the Baxter heparin Dr. Allen received was contaminated. *See* (*Id.* at 10–12, 16, 18, 21–25; Docs. 151-14, 151-15, 151-16, 151-17.)

Therefore, giving all reasonable inferences to Plaintiffs in interpreting the evidence, there is a genuine issue of material fact as to causation, and as such that issue is appropriate for resolution by the jury.

### V.    Conclusion

For the reasons set forth above,

**IT IS ORDERED** that Plaintiffs' Motion to Exclude Certain Testimony of Dan James Fintel, M.D., (Doc. 147), is **GRANTED in part** and **DENIED in part**.   The motion is granted to the extent that Dr. Fintel's general causation opinion is subject to the same limitations the parties placed on Dr. Gorton's general causation testimony; the motion is denied in all other aspects.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Ronald Moore, R.Ph, (Doc. 149), is **GRANTED in part** and **DENIED in part** as specified above.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Suzanne Parisian, M.D. and Clifford Siporin, Ph.D., (Doc. 150), is **GRANTED**. The MDL Court's limitations on these experts' testimony apply in total.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Plaintiffs' Causation Experts (Anthony Magalski, M.D., Michael E. Gorton, M.D., Joseph E. Kiss, M.D., and Walter P. Jeske, Ph.D.), (Doc. 151), is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants Baxter Healthcare Corporation's and Scientific Protein Laboratories LLC's Motion for Summary Judgment, (Doc. 162), is **GRANTED in part** and **DENIED in part**. Summary judgment is granted to Baxter and SPL against Plaintiffs on Plaintiffs' breach of warranty claims, contained in Counts III and IV, and punitive damages claims. All other claims will proceed to trial.

**IT IS FURTHER ORDERED** that Defendant American Capital, LTD.'s ("ACAS") Motion for Summary Judgment, (Doc. 164), is **GRANTED in part** and **DENIED in part**. Summary judgment in favor of ACAS and against Plaintiffs, is granted on Plaintiffs' breach of warranty claims, contained in Counts III and IV, and punitive damages claims; furthermore, Plaintiffs may not pursue veil piercing claims nor assumption of duty claims to show ACAS' liability. All other claims against ACAS shall proceed to trial.

Dated this 22nd day of December, 2017.

James A. Teilborg
Senior United States District Judge